# CIRCUIT COURT OF FAIRFAX COUNTY

RECP IV WG
Land Investors, L.L.C.

v.

Capital One Bank (USA), N.A.

Case No. CL-2015-9182

BY JUDGE JOHN M. TRAN

May 5, 2016

This matter comes before the Court upon a series of dispositive motions fully briefed and extensively argued by counsel. In rendering this decision, the Court reviewed the pleadings, exhibits as may be considered, supplemental briefs, relevant land records and local ordinances, and the arguments of and cases cited by counsel. The Court also revisited its decision on Capital One's Demurrer. For reasons stated below, the Court sustains Capital One's Demurrer with respect to Count I, sustains the impossibility argument of Capital One's Plea in Bar, grants Capital One's Motion for Summary Judgment with respect to Counts II and III, and denies WG Land's Motion for Summary Judgment.

### I. *Background and Undisputed Material Facts*

This dispute centers on the interpretation of density provisions contained in a September 27, 2000, Purchase Agreement ("Purchase Agreement") for the sale of real property located in Tysons Corner, Virginia, from West*Group Properties, L.L.C. ("West*Group") to Defendant Capital One Bank ("Capital One"). Plaintiff RECP IV WG Land Investors, L.L.C. ("WG Land") is an assignee of the Purchase Agreement.

At the time of sale, West*Group owned two parcels of land. Each parcel contained several building sites, one of which is the 29-acre lot now owned by Capital One and housing its headquarters ("Property" or "Capital One Site"). Each site had a fixed amount of floor area ratio ("FAR") determined by West*Gate based on the total amount of FAR allotted by the County to the entire parcel. The parties used the terms "FAR," "Floor Area Ratio," "Density Rights," and "Development Rights" interchangeably. Under Section 1 of the Purchase Agreement, "FAR" means floor area ratio as defined by the Fairfax County Zoning Ordinances.

FAR is the relationship between the total amount of a building's useable floor area and the total area of the lot upon which the building stands. For example, a FAR of 1.0 means that a landowner is allowed to build the equivalent of a one-story building over the entire lot or a two-story building over half the lot. Whereas, a FAR of 2.0 allows the landowner to build a two-story building over her entire lot or a four-story over half. Another way of describing FAR, as chosen by the parties here, is to list the amount of square feet with which a landowner may develop. The use and transfer of FAR is governed by the county and applicable land use laws.

In 2000, the Capital One Site received a maximum of 1.1 million square feet of FAR. In anticipation of future changes to the FAR of properties in the Tysons Corner area due to the arrival of metro stations, the Purchase Agreement and a subsequently recorded restrictive covenant set forth various provisions on how the parties would apportion either an increase or decrease in FAR.

In 2010, Fairfax County eliminated the cap on FAR for properties located within a quarter-mile of a Tysons Corner metro station, which include the Capital One Site and properties owned by West*Group. Under the 2010 Comprehensive Plan, the transfer of FAR from property located within the quarter-mile radius to land located beyond is prohibited. Capital One submitted a re-zoning application and received approval to develop up to an additional 3.8 million square feet of FAR.

WG Land, as assignee and successor to West*Group, contends that Capital One breached the Purchase Agreement by not making a portion of that FAR available for it to use pursuant to the density provisions therein. WG Land defines "use" as meaning that Capital One must set aside a certain amount, as determined by the Formula, and is prohibited from using the remainder. In other words, WG Land contends that the Purchase Agreement acts as a perpetual restrictive covenant and inhibits Capital One's ability to compete against WG Land by indefinitely limiting Capital One's development rights.

## A. *The 1992 Declaration*

In 1992, West*Gate, a Virginia limited partnership, owned a plot of land consisting of approximately 128 acres in the Tysons Corner area of Fairfax County. The maximum FAR for the entire plot was 3,491,841 square feet. West*Gate divided the plot into two parcels, the Prudential Parcel and the West*Gate Parcel, and designated a maximum "Allocable" FAR for each one. The "Allocable" FAR for the Prudential Parcel was 1,664,213. The Allocable FAR for the West*Gate Parcel was 1,827,628. Article IV limited the development within each land bay with a cap of 1.0 FAR.

The rezoning was approved on May 6, 1992, under Action RZ-92-P-001 in connection with a certain Generalized Development Plan (GDP), dated February 10, 1992, as revised on April 21, 1992. West*Gate recorded the division of land in a Declaration of Covenants, Easements, and Related Agreements ("1992 Declaration").

## B. *2000 Purchase Agreement and Supplemental Declaration*

On September 27, 2000, West*Group (successor to West*Gate) executed a real estate purchase agreement with Capital One Financial Corporation (predecessor to Defendant Capital One Bank, USA, N.A.). Under the Purchase Agreement, West*Group conveyed 29.22 acres of land, along with all development rights associated with 1,100,000 square feet of FAR, to Capital One. Section 28.7 of the Purchase Agreement, which pertains to the apportionment of future FAR, states:

> 28.7 *Density Limitation.* The FAR to be associated with the Property shall be limited to the Allocated FAR for a period of eight (8) years after the Closing. Capital One shall not seek

a rezoning of the Property, nor an increase in density for the Property, that would result in FAR in excess of the Allocated FAR being associated with the Property during such eight (8) year period.

(a) If, as a result of the increase in FAR associated with the pending PCA, additional FAR is available for the properties in the area, including the Property and West*Gate Office Park, then all FAR which would otherwise be available for the Property shall be conveyed, allocated, or otherwise made available to West*Group, its successors, or assigns, for their use in connection with other properties now or then owned by them in the area. . . .

(b) If, as a direct result of the funding, design, potential extension, and/or extension of Metro service to the Tysons Corner area, additional FAR is ever available to the Property as a result of . . . (ii) any amendment to the Existing Metro Overlay . . . then:

(A) Subject to clause (D) hereof, 200,000 square feet of such additional FAR (the "Base Capital One Metro FAR Number") shall be retained by Capital One. . . .

(B) [A]ll such additional FAR in excess of the Base Capital One Metro FAR Number . . . (i) if the Existing Metro Overlay remains in effect at that time . . . or (ii) if the Existing Metro Overly has been amended or replaced . . . then an amount of such additional FAR that is equal to the amount thereof that would have been available for the Property if the Existing Metro overlay were still in effect (the "Base West*Group Metro FAR Number") shall be conveyed, allocated, or otherwise made available to West*Group . . . for their use in connection with other properties now or then owned by them in the area;

(C) All such square feet of additional FAR in excess of the aggregate of the Base Capital One Metro FAR Number and the Base West*Group Metro FAR Number that is available to the Property, if any (the "Additional Metro FAR Number") *shall be shared* by Capital One and West*Group as follows: (x) an amount of square feet of such additional FAR equal to the Additional Capital One Metro FAR Number shall be retained by Capital One . . . and (y) an amount of square feet of such additional FAR equal to the Additional West*Group FAR Number shall be conveyed, allocated, or otherwise made available to West*Group for their use in connection with other properties now or then owned by them in the area. For purposes of this paragraph, the "Additional Capital One

Metro FAR Number" shall equal the Additional FAR Number times a fraction the numerator of which is the Base Capital One Metro FAR Number and the denominator of which is the sum of the Base Capital One Metro FAR Number and the Base West*Group Metro FAR Number, and the "Additional West*Group Metro Far Number" shall equal the Additional Metro FAR Number times a fraction the numerator of which is the Base West*Group Metro FAR Number and the denominator of which is the sum of Base Capital One Metro FAR Number and the Base West*Group Metro FAR Number[.]

(D) [Omitted as immaterial to this litigation]

(c) Capital One shall have the right to seek a rezoning . . . special exemption . . . that would affect the Property for additional FAR to take effect following the expiration of the eight (8) year period referred to above, subject, however, to the provisions of the preceding paragraphs . . . *West*Group shall have the right to seek a re-zoning, proffered condition amendment, special exception, or other zoning approval related to (i) the Property (but only for the purpose of obtaining FAR via the Existing Metro Overlay and the provisions of the preceding paragraphs) to take effect following the expiration of the eight (8) year period referred to above, subject, however to the provisions of the preceding paragraphs. . . .* The eight (8) year restriction described in this Agreement does not apply to property (other than the Property) owned by West*Gate in the West*Gate Office Park; therefore, West*Group shall have the right to seek a re-zoning, proffered condition amendment, special exception, or other zoning approval related to such remaining property for additional FAR for any other purpose at any time. West*Group and Capital One shall each cooperate with the other with respect thereto, including giving the other prompt notice of any such action and joining in (but retaining the right to oppose in public forum) any zoning application or proceeding, and the costs related to any such application or proceeding (including costs of proffers) related to the Property shall be shared equitably on the basis of the additional FAR square feet allocated between the parties. *Notwithstanding the foregoing, neither Capital One nor West*Group shall have any obligation to cooperate in, and shall have the right to oppose, any action proposed by the other that would result in an adverse financial impact or in an adverse density limitation (other than the impacts or limitations expressly contained in this Agreement)* on such party or its successors or assigns. . . . *In addition, to the extent that any of the Property*

*is included in an application filed by West\*Group or Capital One, respectively, then such included property shall have the right to receive its pro rata share, determined by land area, of additional FAR obtained as a result of such application.*

(d) The foregoing matters shall be reflected in a covenant encumbering the Property and benefitted properties of West\*Group (*i.e.,* the remaining property in the West\*Gate Office Park) recorded among the land records of the Clerk of the Circuit Court of Fairfax County, Virginia.

(Emphasis added.)

The parties recorded a Supplemental Declaration and Restrictive Covenant dated December 5, 2000, which repeated verbatim selected portions of § 28.7. The Supplemental Declaration added an additional paragraph that stated:

6. The additional FAR described in Paragraphs 4 [repeating ¶ 28.7(b)] and 5 [repeating ¶ 28.7(c)] does not represent the Allocable FAR as defined in the Declaration and, if obtained, shall not be governed by the terms of the Declaration absent a further amendment to the Declaration entered into by all of the appropriate parties.

Another relevant and material section of the Purchase Agreement states:

30. *West\*Group's Repurchase Rights:*

30.1 *Right of First Offer: Excluded Transfers.* West\*Group is conveying the Property to Capital One for its own use and occupancy. West\*Group would not convey the Property, or any portion thereof, to Capital One or any other party for the purpose of developing the Property in competition with West\*Group's other properties in the vicinity of the Property. *West\*Group understands, however, that Capital One's need or desire in the Property or the Land may change following Closing.* Accordingly, if Capital One desires to sell, ground lease, master lease, lease . . . or otherwise transfer . . . the Property . . . any improvements now or hereafter constructed on the Property, or any FAR associated with the Property, in any case *prior to the 10th anniversary of the Closing, then West\*Group shall have a right of first offer. . . .*

(Emphasis added.) All the quoted sections of the Purchase Agreement were pivotal provisions defining the rights and obligations of the parties in this case. The Court emphasized phrases that drew its attention in defining the agreement when it considered the arguments of counsel. The ultimate question presented is whether § 28.7(b) acts as a perpetual restriction on Capital One's development rights, or calls for the sharing of additional

FAR rights. The Court concluded that summary judgment is appropriate in finding that § 28.7(b) does not act as a perpetual restriction and certainly, not in the manner as described by WG Land given the circumstances of this case.

## C. *2010 Comprehensive Plan and The Alleged Breach*

Prior to 2010, every version of Fairfax County's zoning laws placed a ceiling on the amount of available FAR. However, under the 2010 Fairfax County Comprehensive Plan ("Plan"), the County eliminated the cap on FAR for properties within a quarter-mile of a Tysons Corner metro station. In other words, the Capital One Site was no longer subject to a maximum FAR. The Plan also set forth that, under no circumstance, is FAR permitted to be transferred from an area without a maximum FAR to an area located more than a quarter of a mile from a Tysons Corner metro station.

Capital One applied for rezoning and gained the County's approval to develop up to an extra 3.8 million square feet of FAR. Capital One began developing in contemplation of using the entire amount.

## D. *Tracing Ownership and Assignment*

In 2000, West*Group owned the contract rights to the Purchase Agreement and owned fee simple title to ten properties, Cleveland, Dartford, Grant, Johnson I, Johnson II, Lincoln, Taft, Taylor, Van Buren, and WestGate, within a quarter-mile of a Tysons Corner metro station that are subject to the density provisions.

On July 22, 2010, West*Group assigned its contract rights and transferred ownership of those properties over to Plaintiff WG Land. That same day, WG Land assigned and transferred the same to individual and separate special purpose entities. WG Land is a majority owner of each entity. Lastly, on May 12, 2015, each special purpose entity assigned their rights under the Purchase Agreement to "Capital One Intangibles" back to WG Land, but not title to their respective property. Thus, although WG Land is an assignee of the Purchase Agreement and the intangible FAR rights held by the Special Purpose Entities, it owns no interest in those properties nor any other property in the Commonwealth.

## *II. Standard of Review*

### A. *Demurrer*

At the demurrer stage, a trial court does not decide the merits of the claim, but determines whether, when accepted as true, the facts pleaded and the reasonable inferences drawn therefrom are sufficient to state a cause of action. *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 143, 747 S.E.2d 804, 807 (2013). "[U]nlike a motion for summary judgment, a demurrer

'does not allow the court to evaluate and decide the merits of a claim'." *Id.* (quoting *Fun v. Virginia Military Inst.*, 245 Va. 249, 252, 427 S.E.2d 181, 183 (1993)). Further, a demurrer does not admit the correctness of any stated conclusions of law. *Harris v. Kreutzer*, 271 Va. 188, 195, 624 S.E.2d 24, 28 (2006).

To survive demurrer, the pleading must be made with sufficient definiteness to enable the court to find the existence of a legal basis for its judgment. *Malyevac*, 286 Va. at 143. Where it is plain on the record that there is no basis for the requested relief, a demurrer should be sustained. *See id.*

## B. *Plea in Bar*

A plea in bar reduces litigation to a single, distinct issue of fact, which, if proven, creates a bar to a plaintiff's recovery. *Smith v. McLaughlin*, 289 Va. 241, 252, 769 S.E.2d 7, 12 (2015). A plea in bar can be sustained even if it presents a bar to recovery to only some, but not all, of the claims. *Id.* At this stage, the court's decision may be based on the facts identified in the pleadings or evidence presented. *Hawthorne v. VanMarter*, 279 Va. 566, 577, 692 S.E.2d 226, 233 (2010). If any facts are disputed and no demand for a jury is made, the "whole matter of law and fact" may be decided by the court. *Id.*

## C. *Summary Judgment*

Summary judgment is a drastic remedy which is available only where no material facts are genuinely in dispute on a dispositive issue. *Smith by Rosen v. Smith*, 254 Va. 99, 103, 487 S.E.2d 212, 215 (1997). At this stage, the court will accept as true "those inferences from the facts that are most favorable to the non-moving party, unless the inferences are forced, strained, or contrary to reason." *Hansen v. Stanley Martin Cos.*, 266 Va. 345, 351, 585 S.E.2d 567, 571 (2003).

In addition to the parties' pleadings, requests for admission, and interrogatories, see *id.*, construction of a controlling document may also be an appropriate basis for summary judgment, but only where it is shown that the moving party is entitled to judgment as a matter of law. *Leeman v. Troutman Builds, Inc.*, 260 Va. 202, 206, 530 S.E.2d 909, 911 (2000). Where the instrument is ambiguous, requires parol evidence, or turns on other proof of its meaning or the intentions of the parties, summary judgment is inappropriate. See *Ciejek v. Laird*, 238 Va. 109, 113, 380 S.E.2d 639, 641-42 (1989).

Here, the summary judgment decision is aided by the parties' request for the Court to take judicial notice of recorded documents in the land records of the Circuit Court. These were attached and made part of the Complaint under an Order Craving Oyer dated October 28, 2015.

Additionally, the Court takes notice of WG Land's failure to respond to the new matters asserted in Capital One's affirmative defenses, to which Capital One requested a reply. See Rule 3:11; *Northern Va. Real Estate, Inc. v. Martins*, 283 Va. 86, 97, 720 S.E.2d 121, 126 (2012). The factual assertions deemed admitted are as follows:

(1) Plaintiff has allowed Capital One to rezone and develop the property without objection in the development process [Affirmative Defenses at ¶ 3];

(2) Plaintiff has also affirmatively expressed, through a letter dated May 9, 2014, that it had no objection to Capital One's PCA zoning application which did not include the allocation of FAR or development rights to Plaintiff [Affirmative Defenses at ¶ 3];

(3) Plaintiff does not own any of the properties allegedly injured by Capital One's development of its Property [Affirmative Defense at ¶ 6];

(4) Plaintiff has suffered no [quantifiable] damages resulting from any conduct on the part of Capital One. [Affirmative Defense at ¶ 8. This finding is also supported by WG Land's Answers to Interrogatories and the April 5, 2016, Order];

(5) Plaintiff, through its agent, has applied for rezoning of properties allegedly affected by Capital One's development of the Property. The rezoning for these properties have been approved. Those rezoning applications contained the maximum density that each property could physically maintain [Affirmative Defense at ¶ 8]; and

(6) The properties that are allegedly affected by Capital One's development of the Property are owned by special purpose limited liability companies. [Affirmative Defense at ¶ 9.]

The Court declines to grant WG Land leave to respond to the Affirmative Defenses due to the absence of good cause. Moreover, upon considering the volume of materials and arguments advanced by WG Land, its insistence on the plain meaning of the Purchase Agreement, and the prior Order of this Court precluding WG Land from introducing evidence of monetary or quantifiable damages, the Court finds that there is no prejudice to WG Land and substantial prejudice to Capital One to allow an amendment at the close of discovery.

### III. Analysis

This Opinion first addresses the Court's decision on Capital One's Demurrer with respect to Count I (Declaratory Judgment). It then analyzes whether WG Land has standing to enforce the covenants and, lastly, resolves the issues raised in Capital One's Plea in Bar and the parties' cross-motions for summary judgment.

A. *The Demurrer to Count I (Declaratory Judgment) is Sustained With Prejudice*

In December 2015, the Court overruled Capital One's demurrer with respect to all counts. After revisiting the decision, this Court sustains the demurrer to Count I without leave to amend for two reasons. First, WG Land seeks determination of a disputed issue. Second, a declaration in this proceeding would be an advisory opinion. Had Count I survived demurrer, it would have also been dismissed in favor of Capital One at the summary judgment stage, as the Court would have declined to issue a declaratory judgment under the undisputed facts of this case.

1. *WG Land Seeks Determination of a Disputed Issue*

In Count I, WG Land seeks several declarations, including that the contract is valid and enforceable and that Capital One's plans and continuing activities to develop the property are in violation of the contract. Capital One argues declaratory judgment is improper because the parties are already at issue. Relying on *Blodinger v. Broker's Title, Inc.*, 224 Va. 201, 294 S.E.2d 876 (1982), WG Land claims a declaration is appropriate to address the harm it continues to suffer from Capital One's continuing breach.

Under Va. Code § 8.01-184, circuit courts have the power to make "binding adjudications of right" in cases of "actual controversy" when there is "antagonistic assertion and denial of right." The purpose of declaratory judgment is to provide preventive relief — to resolve "uncertainty and insecurity attendant upon controversies over legal rights" before the claims and rights asserted all accrue and mature. *Liberty Mut. Ins. Co. v. Bishop*, 211 Va. 414, 418, 177 S.E.2d 519, 522 (1970). Stated differently, the intent is to render judgments "which may guide parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights, which action, without direction, would jeopardize their interests." *Id.* at 421. The point is to avoid litigation rather than aid it. *See id.*

"Where a declaratory judgment as to a disputed fact would be determinative of issues, rather than a construction of definite stated rights, status, and other relations, commonly expressed in written instruments, the case is not one for declaratory judgment." *Green v. Goodman-Gable-Gould Co.*, 268 Va. 102, 107, 597 S.E.2d 77, 80 (2004).

WG Land argues that Capital One's wrongful retention of excess FAR is a reoccurring harm rendering declaratory judgment appropriate. In *Blodinger*, the plaintiff attorneys sought a determination that the defendant title insurance company was engaged in the unauthorized practice of law by participating in real estate closings. 224 Va. at 203. The attorneys were concerned, on the one hand, with their potential liability for future anti-trust damages if they unjustifiably refused to deal with the defendant and,

on the other hand, with future disciplinary violations if they dealt with the defendant and it should later be held to be engaged in the unauthorized practice of law. *Id.* The Supreme Court reversed the trial court, and found that declaratory judgment was proper because the case involved an "alleged continuing harm and mounting damages," and the plaintiffs should not be required to wait to be sued and subject themselves to increasing liability until such time as the defendant saw fit to file a lawsuit against them. *Id.* at 204; see also *Hop-In Food Stores v. Serv-N-Save*, 237 Va. 206, 375 S.E.2d 753 (1989) (holding declaratory judgment proper where the plaintiff would have been compelled simply to wait until the defendant decided to file a lawsuit, while, in the meantime, it continued to accrue an additional potential liability for damages each day).

Unlike *Blodinger*, WG Land is not standing in the position of a party who is accruing additional liability, waiting to be sued. Rather, WG Land is claiming that it "has sustained and will continue to sustain . . . irreparable harm." See Compl., ¶ 64. The remedy where a party continues to suffer harm is injunctive relief, not declaratory judgment. See *Liberty Mut. Ins. Co. v. Bishop*, 211 Va. 414, 421, 177 S.E.2d 519, 524 (1970) ("[Declaratory judgment] will not as a rule exercised where some other mode of proceeding is provided.").

Further, Capital One's development activities do not subject either party to additional liability such that declaratory judgment is necessary to guide future conduct. The alleged breach occurred when Capital One refused to relinquish a portion of the 3.8 million square feet of FAR. Contrary to WG Land's allegation, what Capital One does or does not do with that FAR is not evidence of a "continuing breach." Rather, they are actions incidental to the breach. See *Westminster Investing Corp. v. Lamps Unlimited*, 237 Va. 543, 545, 379 S.E.2d 316, 317 (1989) (rejecting the tenant's "continuing breach" theory that a separate cause of action spawned each day the landlord failed to enforce uniform operating hours in violation of a contract); *cf. Hampton Rds. Sanitation Dist. v. McDonnell*, 234 Va. 235, 239, 360 S.E.2d 841, 844 (1987) (finding that a new cause of action arose upon each discharge of sewage onto a landowner's property where the discharges were not continuous, but occurred in random intervals). Thus, a declaration here would not impact Capital One's current development.

Ultimately, the true object of Count I is to seek determination of a disputed issue, whether Capital One breached the agreement by obtaining the entirety of the FAR and not allocating any portion to WG Land. Instead, Capital One has proceeded with development under its interpretation of the contract, and the rights of the parties have been fully invaded.

## 2. *Granting a Declaration Judgment Would Result in an Advisory Opinion*

Section 8.01-184 is to be "liberally interpreted and administered with a view to making the courts more serviceable to the people." *Reisen v. Aetna Life & Cas. Co.*, 225 Va. 327, 331, 302 S.E.2d 529, 531 (1983). However, the power to make a declaratory judgment lies within the sound discretion of the trial court, and "must be exercised with care and caution." *Bishop*, 211 Va. at 419, 421.

The statute does not confer upon trial courts the authority to render advisory opinions. *Id.* at 418. "Actions or opinions are denominated 'advisory'. . . where . . . the judgment could not be sufficiently conclusive." *Erie Ins. Grp. v. Hughes*, 240 Va. 165, 170, 393 S.E.2d 210, 212 (1990). An example includes when all parties to the controversy are not included. *See id.*

The findings requested would not conclusively control the future obligations of the parties. As can be seen here with the 2010 Comprehensive Plan, the contractual obligations of the parties may change again depending on future legislative amendments. The issue framed by the parties is whether Capital One breached their obligation by making use of additional FAR that it was required to set aside for WG Land. There is no assertion of future conduct that requires a judicial determination. Therefore, issuing a declaratory judgment as to other potential disputes concerning the Purchase Agreement or Supplemental Declaration would be advisory.

For the reasons above, the demurrer with respect to Count I is sustained, and Court I is dismissed.

## B. *As Assignee of the Purchase Agreement, WG Land Has Standing To Enforce the Terms Under § 28.7*

Capital One argues that WG Land has no standing to enforce the restrictive covenant as non-landowners. WG Land counters that its standing derives from its status as assignee of the Purchase Agreement, assignee of the right to enforce the restrictive covenant, and as majority owner of the entities that own the affected properties. Capital One responds that a property interest is essential to the enforcement of a covenant that runs with the land.

The first issue is whether WG Land has vertical privity to enforce the covenant. The second is whether assignees of the right to enforce a restrictive covenant possess standing, absent any interest whatsoever in the land. The final question is whether WG Land has standing as assignee of the Purchase Agreement.

Although the moving party generally bears the burden, the threshold question of standing must be answered by the plaintiff. See *Friedberg v. Riverpoint Bldg. Comm.*, 218 Va. 659, 665, 239 S.E.2d 106, 110 (1977);

see also *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992).

The general notion of standings is as follows:

> A party has standing if it can show an immediate, pecuniary, and substantial interest in the litigation, and not a remote or indirect interest. The concept of standing concerns itself with the characteristics of the person or entity who files suit. The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case. In asking whether a person has standing, we ask, in essence, whether he has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed.

*Westlake Props. v. Westlake Pointe Prop. Owners Ass'n*, 273 Va. 107, 120, 639 S.E.2d 257, 265 (2007) (internal citations omitted; internal quotations omitted).

### 1. *WG Land Lacks Vertical Privity*

As argued by the parties, this case centers on an easement appurtenant that runs with the land. To enforce it, WG Land must show (1) horizontal privity; (2) vertical privity; (3) intent for the restriction to run with the land; (4) that the restriction touches and concerns the land; and (5) that the covenant is in writing. *Barner v. Chappell*, 266 Va. 277, 283, 585 S.E.2d 590, 594 (2003). Capital One claims Plaintiff lacks vertical privity.

Vertical privity exists when there is privity between the original parties and their successors-in-interest. *Id.* at 284. More precisely, vertical privity requires that the benefit of a restrictive covenant extend only to "one who succeeds to some interest of the beneficiary in the land respecting the use of which the promise was made." *Id.*

By its own admission and as demonstrated by its answer to an interrogatory propounded by Capital One, WG Land is not in vertical privity with West*Group. See Def. Mot. Ex. 1, at 5. WG Land does not hold an estate in any benefited land or a lesser possessory estate in any benefited land. It is neither a fee simple titleholder, lessee, nor the assignee of a lease.

Although WG Land owns a majority interest in a number of special purpose entities that have possessory interests in benefited land, "[i]n a Virginia limited liability company, members have no direct interest in the company's property." *JTB Enters., L.C. v. D & B Venture, L.C. (In re DeLuca)*, 194 B.R. 79, 88 (Bankr. E.D. Va. 1996). Therefore, even if WG Land exercises "sole and exclusive" control over a benefitted property by virtue of an operating agreement, it is not a successor in interest through

possession of the covenantee's estate or a lesser possessory estate. Those rights belong exclusively to the special purpose entities and not their members. *Cf. Bentley Funding Grp., L.L.C. v. SK&R Grp., L.L.C.*, 269 Va. 315, 331, 609 S.E.2d 49, 57 (2005) ("Development rights are property rights. *Although less than a fee interest,* development rights are beyond question a valuable right in property.") (emphasis added).

### 2. *WG Land Lacks Standing as Assignee of the Right To Enforce a Restrictive Covenant*

WG Land argues that its standing is derived from receiving the right to enforce the restrictive covenant. However, Virginia has taken the narrow approach that, generally, the right to enforce a restrictive covenant cannot be assigned to a non-landowner.

This is distinguishable from homeowners associations that have standing to enforce restrictive covenants absent ownership in land. See Va. Code Ann. § 55-515 (Property Owners' Association Act) ("Every lot owner, and all those entitled to occupy a lot shall comply with all lawful provisions of this chapter and all provisions of the declaration. Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, *maintainable by the association,* or by its board of directors or any managing agent on behalf of such association, or in any proper case, by one or more aggrieved lot owners on their own behalf or as a class action.") (emphasis added); *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 784 S.E.2d 280, 2016 Va. lexis 7, *6 (2016) ("The Virginia Property Owners' Association Act, Va. Code §§ 55-508 to 55-516.2, expanded the concept of privity considerably beyond common-law limits. In general terms, the Act permits the creation of a restrictive covenant running with the land and enforceable against subsequent owners of the parcels covered by the declaration, whether or not they consent, *so long as the association follows the statutorily prescribed procedures governing the association's declaration and amendments to it.*") (emphasis added).

"The common law regarding covenants requires that a person own land that benefits from the restriction in order to have standing to enforce it." 20 Am. Jur. 2d, *Covenants, Conditions, and Restrictions,* § 245 (2d 2015). "Thus, restrictive covenants generally are only enforceable between property owners." *Id.*; see also *Lakewood Racquet Club, Inc. v. Jensen*, 156 Wash. App. 215, 228, 232 P.3d 1147, 1153 (2010) ("[C]ovenantees may enforce restrictive covenants only if they have a justiciable interest in enforcement, generally an ownership interest in the benefited property."); *Shaff v. Leyland*, 154 N.H. 495, 499, 914 A.2d 1240, 1244 (2006) (finding that the original grantor lacked standing because she no longer owned land that benefited from the covenant); *McLeod v. Baptiste*, 315 S.C. 246, 247, 433 S.E.2d 834, 835 (1993) (finding that the original grantor lacks

standing to enforce a covenant against a remote grantee when the grantor no longer owns real property which would benefit from the enforcement of that restrictive covenant); *Waikiki Malia Hotel, Inc. v. Kinkai Properties, L.P.,* 75 Haw. 370, 383, 862 P.2d 1048, 1057 (1993) ("In order to enforce a covenant appurtenant, a covenantee must continue to own the parcel of land benefitted by the covenant appurtenant.").

In other words, the benefit of an easement appurtenant may not be separated from the property. See *Burton v. Chesapeake Box & Lumber Corp.,* 190 Va. 755, 764, 57 S.E.2d 904, 908 (1950) ("Covenants contained in a lease or conveyance of land are said to run with the land when they are of such character that the benefits and burdens thereof pass with the land to the assignee, into whosesoever hands the land may come."); *Lynch v. Town of Pelham,* 167 N.H. 14, 21, 104 A.3d 1047, 1053 (2014) (stating that the rights or obligations of a covenant appurtenant are "tied to ownership or occupancy of a particular unit or parcel of land"); see also *Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners,* 160 S.W.3d 657, 666 (Tex. App. 2005) (finding successor-in-interest who did not own any neighboring parcels could still enforce the restrictive covenant as it was an easement in gross); *Christiansen v. Casey,* 613 S.W.2d 906, 909 (Mo. App. 1981) (holding that the original grantor who no longer owned land in the parcel at issue had standing to enforce an easement in gross).

Additionally, the Virginia Supreme Court appears to condition the enforcement of an equitable servitude upon a more significant possessory interest than that which WG Land purports to hold under the operating agreements:

> [W]here a common grantor develops land for sale in lots and pursues a course of conduct which indicates an intention to execute a general scheme or plan of improvement for the benefit of himself and the purchasers of the various lots, and by numerous conveyances incorporates in the deeds substantially uniform restrictions, conditions, and covenants against the use of the property, the grantees acquire by implication the equitable right, sometimes referred to as an implied reciprocal negative easement, to enforce similar restrictions against the residential lot or lots retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenant.

*Mid-State Equip. Co. v. Bell,* 217 Va. 133, 141, 225 S.E.2d 877, 884 (1976). But see *McDonald's Corp. v. Saul Holdings, L.P.,* 1999 Va. Cir. lexis 744, *2 (Loudoun Nov. 23, 1999) ("It is not necessary to the establishment of an equitable servitude that the complainant be a party to the transfer of land.").

Moreover, in *Old Dominion Iron & Steel Corp. v. Virginia Elec. & Power Co.,* 215 Va. 658, 663, 212 S.E.2d 715, 719-20 (1975), the defendant argued

that, under the express provision of the covenant, only "successors in title," *i.e.* subsequent owners of fee simple title, have standing to enforce. *Id.* at 663. Thus, the defendant claimed that the plaintiff lessee had no standing. The court cited to § 547 of the Restatement of Property, titled "Privity Between Beneficiary and Successor," in holding that the "successors in title" provision required at least "some interest" of the beneficiary of the land. *Id.*

Based on the narrow approach the Virginia Supreme has adopted towards restrictive covenants, the assignment of the right to enforce the restrictive covenant to a non-landowner does not confer standing upon that third party. Accordingly, WG Land has no standing by virtue of such assignment.

### 3. *WG Land Has standing To Enforce the Purchase Agreement*

WG Land, however, has standing as an assignee of the Purchase Agreement. Capital One attacks WG Land's breach of contract theory, arguing, "[t]he right to enforce the covenants was extended solely to each 'Owner'," a term defined in the Declaration to mean "person(s) who from time to time is (are) the owner of fee simple title." Def. Mot. 4. Capital One contends that WG Land cannot enforce any restrictive covenant as a matter of contract because, regardless of its status as an assignee of West*Group, WG Land is not a fee simple "Owner" as contemplated by the Declaration. Def. Mot. 4. For that same reason, Capital One asserts WG Land cannot enforce any covenant under the Purchase Agreement as a matter of contract because the Purchase Agreement incorporates "[t]he concept of Owner's rights for the benefit of Sites," as set forth in the Declaration. Def. Mot. 5.

WG Land dismisses Capital One's contract argument on the basis that "both the Contract and the Covenant make clear that WG Land, as West*Group's assignee under both instruments, and as the 'Declarant' under the Covenant, is an intended beneficiary of the restrictive covenant, regardless of whether it holds fee simple title." Pl. Opp'n 2. Plaintiff also points out that the parties did not incorporate the defined term "Owners" from the Declaration into the Purchase Agreement in order to allow an assignee like WG Land to enforce the Declaration through a breach of contract cause of action. Pl. Opp'n 1-2. WG Land contends that, because it stands in the shoes of West*Group as its assignee, WG Land has a contractually enforceable right as the "Declarant." WG Land notes that "Declarant" is defined in the Declaration "without any reference to, or requirement of, fee simple title" and includes "successors and assigns." Pl. Opp'n 3; *see also* Compl. Ex. B, at art. 1, § 1.3 (defining "Declarant").

"It is well settled that contract rights and obligations are assignable unless restricted either by law or the parties themselves." *Daugherty v. Diment,* 238 Va. 520, 524, 385 S.E.2d 572, 574 (1989). "An assignee obtains his rights from the assignor, and, thus, he is said to 'stand in the shoes' of the assignor when pursuing an action on the contract or instrument assigned."

*Long, Long & Kellerman, P.C. v. Wheeler,* 264 Va. 531, 538, 570 S.E.2d 822, 826 (2002).

The Purchase Agreement limits only West*Group's right to assign its right of first offer upon a sale of the Property, which expired in 2010. All other rights, including those related to FAR, remain freely assignable. See, *e.g.,* Compl. Ex. A, at § 30.8 (Assignability). Therefore, applying the parties' defined terms and also incorporating them by reference for the purpose and extent indicated in the writings, WG Land is entitled to stand in the shoes of West*Group as its assignee under the contract. Consequently, WG Land has standing to bring a cause of action for breach of contract against Capital One and seek injunctive relief. The defined term "Owner" cannot reasonably be read to control all three writings in a manner that limits standing to fee simple titleholders only.

Here, the only difference in outcome in terms of whether WG Land can enforce the contract or the covenant running with the land would have been WG Land's ability to seek recovery of attorney's fees under Section 7.3 of the 1992 Declaration. Otherwise, the potential relief is the same, whether an action is brought under the Purchase Agreement or the Declaration.

C. *The Purchase Agreement Does Not Preclude WG Land From Seeking Injunctive Relief*

Capital One contends that WG Land is barred by the contract from seeking injunctive relief. The Court disagrees.

A contractual limitation of remedies provision will only be construed to describe an exclusive remedy when the language used clearly demonstrates an intent to bar other remedies. See Va. Code § 8.2-719, cmt. 2 ("Subsection (1) (b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed."); *Bender-Miller Co. v. Thomwood Farms, Inc.,* 211 Va. 585, 588, 179 S.E.2d 636 (1971) ("The better rule is that the remedy provided will be exclusive of other possible remedies only where the language employed in the contract clearly shows an intent that the remedy be exclusive."). Because an express intent is required, the canon of *"expressio unius est exclusion alterius"* is inapplicable.

Here, Capital One raises the following provision: "In the event of any violation . . . an Owner shall in addition to such other rights or remedies permitted under the laws of the Commonwealth of Virginia have the right to enjoin such violation." This fails to demonstrate an intent to bar other privies from seeking injunctive relief. Moreover, Capital One's reference to § 15.2 is unpersuasive as that section deals with pre-closing remedies.

Capital One's position is further contradicted by § 34(b), which provides that Capital One's obligations and "its post-Closing obligations set forth in Sections 13.7, 15.3, 24, 28, 29, 30, and 32 . . . shall survive Closing and

shall not be limited to the amount of the Deposit. A plain reading of § 34(b) compels denial of Capital One's argument of preclusion.

D. *Counts II (Injunctive Relief) Is Dismissed Because the Formula Is Unworkable and the Specific Relief Requested is Not Warranted*

To acquire injunctive relief, WG Land must prove a breach, among other elements. "[A] restrictive covenant is a right in property and constitutes an interest in land." *NBS Loudoun Gateway IV, L.L.C. v. Commonwealth Transp. Comm'r*, 63 Va. Cir. 342, 344 (Loudoun 2003); see also *Shirlington Drug Store, Inc. v. Shirlington Corp.*, 199 Va. 112, 117, 97 S.E.2d 652, 655 (1957) (holding that the right to enforce a restrictive covenant "constituted an interest in land"); *Meagher v. Appalachian Elec. Power Co.*, 195 Va. 138, 145, 77 S.E.2d 461, 465 (1953) ("[R]estrictive covenants create a valuable right in property."). Thus, the "mere breach [of a contract affecting real property] is sufficient ground for interference by injunction" without a showing of damages. *Meagher*, 195 Va. at 147. However, affirmative defenses may be asserted to bar an action or a suit in equity. *Paddock v. Mason*, 187 Va. 809, 816, 48 S.E.2d 199, 202 (1948).

Restrictive covenants on land are not favored, and must be strictly construed. *Barris v. Keswick Homes, L.L.C.*, 268 Va. 67, 71, 597 S.E.2d 54, 57 (2004). "Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property." *Id.* However, when the terms of a restrictive covenant "are clear and unambiguous, the language used will be taken in its ordinary signification, and the plain meaning will be ascribed to it." *Id.*

"In construing a contract, a court must 'read the contract as a single document, the meaning of which is gathered from all its associated parts when assembled as the unitary expression of the agreement of the parties'." *First Am. Title Ins. Co. v. Seaboard Sav. & Loan Asso.*, 227 Va. 379, 384, 315 S.E.2d 842, 845 (1984). "It is the court's duty to declare what the *instrument itself* says it says." *Ames v. American Nat'l Bank*, 163 Va. 1, 38, 176 S.E. 204, 216 (1934). When two provisions of a contract seemingly conflict, if, without discarding either, they can be harmonized so as to effectuate the intention of the parties as expressed in the contract considered as a whole, this should be done. The presumption always is that the parties have not used words aimlessly and that no provision is merely a superfluity unless it is plainly merely a repetition. *Id.* A specific provision of a contract governs over one that is more general in nature. *Condominium Servs. v. First Owners' Ass'n of Forty-Six Hundred Condo., Inc.*, 281 Va. 561, 573, 709 S.E.2d 163, 170 (2011).

The Purchase Agreement and Supplementary Declaration, when read as a whole, establish the restriction of development rights only for a set period of time. After that initial eight year period, the parties were to share FAR when needed, requested, or as it became available. The Purchase Agreement

does not act as an indefinite restriction of Capital One's development activities. Additionally, it cannot be read to require Capital One to simply set aside FAR it is entitled to use, regardless of the fact that the County eliminated the cap on FAR. This lifting of the cap, however, makes the sharing Formula unworkable and equitable relief improper.

### 1. *The Formula Is Unworkable*

Capital One argues that the sharing Formula is impossible to perform because the additional FAR available is infinity. WG Land argues that the actual number of FAR received in Capital One's Rezoning Application, 4,969,523, is the "Additional Metro FAR Number." This issue turns on whether the phrase "If . . . additional FAR is ever available to the Property" means square footage made available due to a change in the FAR value (*e.g.*, a change from a FAR of 1.5 to a FAR of 3.5 in a metro overlay), or the amount approved for development in a re-zoning application submitted to the County.

Virginia recognizes the defense of impossibility to breach of contract actions:

> [I]f a promisor's contractual performance is made impossible by a change in character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance, the promisor will be excused, unless he . . . expressly agreed in the contract to assume the risk of performance.

*Long Signature Homes v. Fairfield Woods*, 248 Va. 95, 98-99, 445 S.E.2d 489, 491 (1994) (internal quotations omitted). Put differently, if the act to be performed is necessarily dependent on the continued existence of a specific thing, the perishing thereof will excuse non-performance of the contract. *Housing Auth. of Bristol v. East Tenn. Light & Power Co.*, 183 Va. 64, 73, 31 S.E.2d 273, 277 (1944). The burden of proof here lies with Capital One. *Paddock v. Mason*, 187 Va. 809, 817, 48 S.E.2d 199, 202 (1948).

As it did in its Plea in Bar, Capital One argued that the Formula for density sharing is impossible to perform. The 2000 Metro Overlay, which was incorporated into the Purchase Agreement, set a FAR value between 1.0 and 1.5 that, when multiplied with the area of a parcel, imposed a cap on the maximum building square footage available for construction. See Def. S.J. Mot. 8; Plea in Bar 3. Under Section 28.7(b)(C) of the Purchase Agreement, if the FAR value (then 1.0 and 1.5) were increased by the County through rezoning, the parties would reallocate the additional square footage available to the parcel, in this case the Property, according to the Formula, using both the 2000 Metro Overlay the Amended Metro Overlay. Def. S.J. Mot. 9.

Section 28.7(b)(C) of the Purchase Agreement requires that "all such square feet of additional FAR in excess of the aggregate . . . shall be shared." The "[a]dditional Capital One Metro FAR Number shall equal the Additional Metro FAR Number times a fraction."

"Additional" FAR is not expressly defined. However, the Court is able to ascertain its plain meaning by analyzing the text of § 28.7(b). "If, as a direct result of . . . extension of Metro service to the Tysons Corner area, additional FAR is *ever available* to the Property as a result of . . . the Fairfax County Comprehensive Plan . . . then [that FAR is to be shared as follows]." (Emphasis added.) Meanwhile, § 28.7(C) states that "Capital One shall have the right to seek a re-zoning . . . for additional FAR *to take effect* following the expiration of the eight (8) year period." (Emphasis added.) Notably, these phrases are contained in two separate sections, each made applicable under different conditions.

Giving each word in the document its full effect, the plain language of § 28.7 recognizes that the "additional" FAR under the Formula is that which is "available" even if re-zoning is required to implement development of the extra FAR. Although "Allocated FAR" is defined under Section 2.1(iii), that definition neither controls nor precludes the definition of "additional FAR" as the available FAR described under Section 28.7(b).

Adopting WG Land's expansive interpretation that additional FAR means FAR that is obtained at any time and by any means, including from a re-zoning project to make use of a set amount of FAR, would create an absurd result. For instance, § 28.7(b)(A) states that, "subject to clause (D) hereof, 200,000 square feet of such additional FAR (the "Base Capital One Metro FAR Number") shall be retained by Capital One. . . ." Compl. Ex. A, at § 28.7(b)(A). Under WG Land's interpretation of the term "available," any time Capital One submits plans for redevelopment, upon approval, Capital One retains 200,000 square feet, but otherwise must immediately revise its plan and reallocate a portion of its approved square footage to WG Land under the Formula. Moreover, if, as WG Land argues, seeking an approval is the only practicable way to obtain additional FAR, there would be no need to have two separate paragraphs addressing the density limitation.

Further, the 1992 Declaration defined Allocable FAR as the amount of density allocated to a site or parcel pursuant to the Declaration or any later recorded amended amendment. See 1992 Declaration Article I (Definitions). The Declaration fixed the Allocable FAR for each site and prohibited reallocation of such FAR absent a recorded amendment. See 1992 Declaration Article II — 2.1(A). The Declaration did, however, provide an exception for future Owners to reallocate Allocable FAR as long as the aggregate did not exceed a cap for the two particular parcels set forth under the Declaration, known as the "Prudential Parcels" and the "West*Gate Parcels."

Moreover, Sections 28.7(b)(A) and 28.7(b)(B), and Paragraphs 4(A) and 4(B) of the Supplemental Declaration, contemplate that, if, as a direct result of an amendment to the existing Metro Overlay, additional FAR becomes "available" to the Capital One Site, then Capital One shall retain the first additional 200,000 square feet of such additional FAR and apply the balance to a Formula. These provisions address the parties' assumptions of what should happen as "a direct result of the funding, design, potential extension, and/or extension of Metro service to the Tysons Corner area." Such additional FAR then translates into the property's new Allocable FAR value.

Additionally, other documents highlight the difference between FAR under § 28.7(b) and FAR under § 28.7(c). The Supplemental Declaration removed Capital One's FAR rights from the Declaration. Specifically, ¶ 6 provides that "The additional FAR described in Paragraphs 4 and 5 hereof (equivalent to ¶ 28.7(b) and ¶ 28.7(c) of the Purchase Agreement) does not represent the Allocable FAR as defined in the Declaration, and, if obtained, shall not be governed by the terms of the Declaration absent a further amendment to the Declaration entered into by all of the appropriate parties. Paragraph 6 of the Supplemental Declaration is an additional term that did not exist under the Purchase Agreement. It confirms the parties agreed to handle Capital One's FAR without the caps and limitations existing under the Declaration. Nonetheless the subsequent amendments and language used by the parties explain the words they used in the Agreement. For example, in 2007, the Owners of the Parcels (including West*Group and Capital One) entered into an Eighth Amendment to the Declaration, containing the provision that nothing in the Declaration shall restrict the right and ability of any Owner to obtain additional FAR on top of its then existing Allocable FAR unless such additional FAR has a negative impact of reducing another Owner's additional FAR previously granted by the County. See Eighth Amendment, Section 2.1.

The Eighth Amendment recognizes that, whenever FAR becomes available, subject to applicable government requirements, as created by the 2007 "Option with Rail" of the Comprehensive Plan, such additional FAR constitutes the defined additional FAR allowed under Section 2. Accordingly, an Owner may commence construction of such additional FAR as permitted under Section 2, without amending the Declaration, as long as the total Allocable FAR available for use by other sites is not reduced. The Eighth Amendment distinguishes FAR that is created as a result of an amended County ordinance from FAR created in all other scenarios. Throughout the various agreements and amendments, the parties recognized that governmental enactments may affect the parties' rights and obligations and therefore, Sections 28.7(b) and 28.7(c) were clearly designed to address different events.

Here, given the now uncapped FAR associated with the Property, the value of the "additional" FAR under the Formula is infinity, which is no longer a numerical value capable of being multiplied. As Capital One states, any number multiplied by infinity equals infinity.

The 2000 Formula depended on the existence of a fixed value of FAR. As the removal of the cap has rendered the Formula unworkable, Capital One is excused from performing. This Court declines to rewrite the Formula to render it workable in an "unlimited FAR" scenario and will apply it as written. See *Richardson v. Virginia Elec. & Power Co.*, 90 Va. Cir. 235, 238 (Norfolk 2015) ("[A] strong[] and long-standing policy is the refusal of Virginia's courts to re-write an agreement between parties.").

Moreover, WG Land's assertion that it can "bank" such FAR is impossible because it owns no property. A requested remedy may be denied if it is impossible for the court to precisely define the specific actions to be performed. *Perel v. Brannan*, 267 Va. 691, 701, 594 S.E.2d 899, 905 (2004) (citations omitted).

Much like an easement appurtenant, density is associated with the land and not the landowner. Thus, if a landowner moved from one parcel to another, he does not take the FAR with him, but assumes what FAR is available at the new parcel. Even under Va. Code § 15.2-2316.2, which allows counties to adopt an ordinance giving landowners the right to transfer FAR, the transfer of development rights must be from a "sending property" to a "receiving property." *Id.* § 15.2-2316.1. Accordingly, the landowners could perhaps "bank" the FAR, but not WG Land. As it is impossible for the court to precisely define the specific actions to be performed in allowing WG Land to "bank" the development rights, such injunctive relief is inappropriate.

Consequently, the overlapping grounds asserted by Capital One in its Plea in Bar and Summary Judgment Motion is sufficient to dismiss Count II (and Count III).

### 2. The Formula Also Became Unnecessary

Capital One contends that the purpose of the covenant is to share additional FAR, but that the transfer of FAR is illegal absent a legislative act from the County. WG Land responds that the purpose is to limit Capital One's development, and thus, no transfer is required. The Court agrees with Capital One. Thus, the Court addresses whether the lifting of the cap defeats the purpose of having to "share" additional FAR arising from legislative amendment.

For the reasons herein, the Court finds from its reading of all the relevant documents that the purpose was to require the parties to "share" additional FAR, rather than "limit" Capital One's use of its FAR rights. Section 28.7(b) of the Agreement addresses when the available FAR changes due to amendments in the existing ordinances. If such changes occurs, the

parties agreed to apply a Formula, the purpose of which is not to restrict Capital One's development rights, but to require the parties to share the FAR amongst the sites within the parcel.

Among other phrases, WG Land relies heavily upon the title of § 28.7 — "Density Limitations" — in arguing that the purpose of the covenant is to limit Capital One's growth. No weight is given to the heading as § 17 states that "Captions and section references . . . are for convenience of reference only, and shall be of no force or effect in construing this Agreement."

Further, the phrase "Density Limitation" plainly refers to the preamble which proscribes an eight-year limitation on FAR. "The FAR to be associated with the Property shall be limited to the Allocated FAR for a period of eight years. . . . Capital One shall not seek a rezoning . . . nor an increase in density . . . that would result in FAR in excess of the Allocated FAR . . . during [the] eight year period." See Compl. Ex. A § 28.7. The Purchase Agreement defines "Allocated FAR" as 1,100,000 FAR square feet. *Id.* Ex. A § 2.1(iii). Thus, for a period of eight years, Capital One's development was limited. To interpret the agreement as extending the limitation would require rewriting the contract.

That preamble is quickly followed by two exceptions that permit growth in that eight-year period. The first, under § 28.7(a), allows the use of additional FAR resulting from a pending PCA (presumably proffered condition amendment) as affecting the Property as well as the West*Gate Office Park. All such "available" FAR is to be conveyed, allocated, or made available for use by West*Group in connection with their properties.

The other exception is under § 28.7(b). Similarly to § 28.7(a), the plain language of the structure of the paragraphs reflect the parties' agreement that, if additional FAR results from an amendment of the "Existing Metro Overlay," such additional FAR is allocated conveyed, allocated, or made available for use, but under a particular Formula.

This interpretation of § 28.7(a) and § 28.7(b) as being an exception to the eight-year restriction is supported by the intentional repetition of the eight-year limit under § 28.7(c), which applies whenever the parties apply for additional FAR. For West*Group to increase the FAR on the Capital One Site, it must be via the Existing Metro Overlay or joint application. Capital One's path to seek additional FAR is by definition limited to its Property. For § 28.7(c) to be meaningful, that "additional" FAR must be density that is additional to or beyond the "allocated" FAR that is determined at the outset or resulting from legislative amendment, and not the "allocated" FAR as defined in § 2.1(iii).

The Purchase Agreement includes various provisions that the parties would "share" such additional FAR. For example, § 28.7(b)(C) states that "all such square feet of additional FAR .. . shall be shared by Capital One and West*Group." Further, the Section calls for the parties, in some instances, to cooperate to obtain additional FAR. See Ex. A §§ 28.7(a), (c).

Section 28.7(a), however, sets out FAR that does not have to be shared. Each subparagraph under Section 28 reflects a different approach to handling FAR.

This "sharing" purpose is supported by the manner in which the FAR was distributed between the Capital One Site and surrounding properties. As indicated in the 1992 Declaration, West*Group had a FAR allotment of roughly 3.4 million square feet over a 128 acre area. West*Group split the FAR between two parcels; the Prudential Parcel received 1.6 million, and the West*Gate Parcel received 1.8 million. Each parcel contained multiple building sites, which received a specific allotment. When Capital One purchased its 29 acre plot within the West*Gate Parcel, West*Group reallocated density from other sites to increase the FAR of the Capital One Site from 339,858 square feet to 1.1 million. See Compl. Ex. A, Exhibit H-2 (Fifth Amendment to Declaration). Expecting that additional FAR would become available in the future, the Purchase Agreement created a Formula as to how such density would be shared amongst the building sites.

WG Land's theory that the Formula reflected an express purpose to perpetually limit Capital One's ability to compete with WG Land is belied by the language in § 30.1.

> 30.1 *Right of First Offer; Excluded Transfers.* West*Group is conveying the Property to Capital One for its own use and occupancy. West*Group would not convey the Property[] . . . to Capital One or any other party for the purpose of developing the Property in competition with West*Group's other properties in the vicinity of the Property. *West*Group understands, however, that Capital One's needs or desire for the Property or the Land may change following the Closing.* Accordingly, if Capital One desires to sell, ground lease, master lease, lease (for a term exceeding ten years 11) . . . or otherwise transfer . . . any FAR associated with the Property, in any such case prior to the 10th anniversary of the Closing, then West *Group shall have a right of first offer.

(Emphasis added.)

The parties knew how to write into an agreement language to limit competition from the Capital One Site. Such language is noticeably absent from § 28.7.

Additionally, WG Land's interpretation of the "made available" clause as meaning a limitation upon Capital One's use is contrary to the plain import of the word. Making something "available" is defined as rendering the item "present or ready for immediate use." *Merriam-Webster Dictionary,* http://wwvv. merriam-webster. com/dictionary/ available (last visited May 4, 2016). Thus, an increase in the allocated FAR, through a legislative amendment, should be ready for immediate use under the formula.

Section 28.7(b)(C) reads as follows:

> (C) all such square feet of additional FAR in excess of the aggregate of the Base Capital One Metro FAR Number and the Base West*Group Metro FAR Number that is available to the Property, if any (the "Additional Metro FAR Number ") *shall be shared* by Capital One and West*Group *as follows*: (x) an amount of square feet of such additional FAR equal to the Additional Capital One Metro FAR Number shall be retained by Capital One . . . and (y) an amount of square feet of such additional FAR equal to the Additional West*Group FAR Number shall be conveyed, allocated, or otherwise *made available* to West*Group *for their use in connection with other properties* now or then owned by them in the area. . . .

(Emphasis added.)

The "made available" clause is encompassed within a Formula that provides Capital One with a set amount of the additional FAR and WG Land with the rest. Thus, the purpose, as ascertained from the plain meaning of the text, was to share the FAR between the two parties.

A consistent theme in the allocation of FAR among the affected properties is one of sharing and assuring that one property does not use up all (or most) of the FAR to the detriment of others. For example, the 2000 purchase resulted in Capital One's 29-acre site holding 61% of the available FAR of the West*Gate Parcel. An approximate calculation of the remaining acres under the West*Gate Parcel, as shown under the July 22, 2010, Assignment of Declarant Rights between West*Group Properties, L.L.C., and WG Land, reflect the other properties approximated 36.51 acres. Consequently, Capital One held approximately 44% of the total land mass, but a greater proportion of the FAR rights under the 2000 purchase. If the parties anticipated that additional (limited) FAR would result from the Metro Overlay or amendment to the Metro Overlay, which they did, it is reasonable to conclude that after giving Capital One an additional 200,000 available FAR, the formula would equalize the retention of FAR over time. However, the legislative lifting of a cap on FAR eliminates the concern that one property can monopolize all of the available density to the parcel.

Moreover, under § 28.7(c) of the Agreement, the parties agreed upon the means under which they could participate in a joint application for additional FAR. The parties may then receive a "*pro rata* share, *determined by land area* of such additional FAR obtained as a result of such application." (Emphasis added.) Section 28.7(c) contemplated a division other than as provided under the Formula and by land area. It further provides that both parties retain the right to oppose any action proposed by the other which would result in an adverse financial impact or adverse density limitation in connection with their respective property.

Taking all these provisions into consideration, for the Court to accept WG Land's arguments and read into the agreement a unilateral (and negative) restriction on Capital One's development rights of FAR obtained by legislative amendment would require an overly expansive and inconsistent interpretation.

Thus, to make the FAR available as contemplated by the Purchase Agreement, the injunction would have to require Capital One to act, rather than refrain. Capital One would have to file an application with the County to reallocate the FAR from its site to the properties within the quarter-mile radius or to WG Land, or otherwise forfeit the additional FAR as a result of its non-use.

Those circumstances, in addition to the laws regulating transfer of density, make this Court question whether injunctive relief would be appropriate. See *Perel v. Brannan*, 267 Va. 691, 701, 594 S.E.2d 899, 905 (2004) ("A requested remedy may be denied if it is impossible for the court to precisely define the specific actions to be performed or if the decree would necessarily be of the type whose enforcement would unreasonably tax the time, attention, and resources of the court."); *McDaniel v. Davies*, 139 Va. 178, 191, 123 S.E. 663, 666 (1924) ("Where a party seeks specific performance of a contract, the terms of the contract must be certain in all particulars essential to its enforcement."); see also *Troche v. Bimbo Foods Bakeries Distrib.*, 2015 U.S. Dist. lexis 108944, \*8 (W.D. N.C. Aug. 18, 2015) ("[S]uch an injunction will generally not be issued to restrain a breach of a long term contract because the Court will not often grant specific performance where, by doing so, it is placed in the position of constantly supervising performance.").

The prohibitory injunction requested by WG Land would result in a negative enforcement of the Purchase Agreement, rather than the affirmative conduct it was meant to compel. See *Lanston Monotype Mach. Co. v. Times-Dispatch Co.*, 115 Va. 797, 805, 80 S.E. 736, 738 (1914) ("An injunction restraining the breach of a contract is a negative enforcement of that contract. The jurisdiction of equity to grant such injunction is substantially coincident with its jurisdiction to compel specific performance.").

The decision to deny injunctive relief is also consistent with the rule espoused in *Booker v. Old Dominion Land Co.*, 188 Va. 143, 49 S.E.2d 314 (1948). Equitable relief is unavailable "if a radical change takes place . . . so as to defeat the purpose of the restrictions and render their enforcement inequitable and oppressive." *Id.* at 148-49. "[E]quity will not compel observance of them by injunction, but will leave the complaining party to his remedy at law." *Id.* "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement." *Id.* at 148.

In *Ault v. Shipley*, 189 Va. 69, 71, 52 S.E.2d 56, 57 (1949), a landowner sought to establish a business on his property, which was prohibited by the restrictive covenants of the residential community where he resided. *Id.* at 75-76. He argued that injunctive relief would be inequitable to enforce the covenant due to changes in the zoning law in favor of business development that defeated the restriction's purpose. The court, however, held that the increase in traffic and development of a business district nearby, coupled with the fact that he might profit by the establishment of a business on his property, "does not justify an invasion of the rights of property owners in [his development] who relied upon the terms of the restrictive covenant when they purchased [such homes]." *Id.* at 78.

Here, the purpose behind § 28.7 was for the parties to share additional FAR, when needed, requested, or as it became available. Like *Ault*, that purpose is not invaded and can still be met without resorting to the Formula. The County simply lifted the requirement of sharing and allowed all properties within the quarter-mile radius to take advantage of unlimited FAR. However, given the specific facts in this case, an injunction requiring Capital One to make the FAR available to the other affected properties would not serve the purpose behind the sharing provision.

The lifting of the cap on FAR allows the other properties then owned by West*Group to apply for re-zoning and use additional FAR as they may require or want. As admitted by failure to respond, WG Land (or the owners of the affected properties) has submitted their own re-zoning application. Those applications contained the maximum density that each property could physically maintain. And notably, WG Land allowed Capital One to rezone and develop without objection in the development process and expressed, by letter dated May 9, 2014, that is had no objection to Capital One's re-zoning application which did not provide for the allocation of such FAR to any of the affected properties. These facts make the Court question whether there was even a breach.

Based on these circumstances, like the FAR cap of the Capital One Site, the need for equitable relief in this matter and at this time is nonexistent. WG Land is not entitled to a jury on its equitable claim seeking injunctive relief. *Norfolk S. Ry. v. E. A. Breeden, Inc.*, 287 Va. 456, 467, 756 S.E.2d 420 (2014).

E. *Count III: Breach of Contract Is Dismissed Because WG Land Has Not Suffered Damages and Its Theory of Recovery Based upon the Value of Capital One's Property Is an Improper Measure of Contract Damages*

In order to state a claim for breach of contract, WG Land must plead and prove (1) a legally enforceable obligation of a defendant to the plaintiff; (2) a violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach. *Ramos v. Wells Fargo Bank*, N.A., 289 Va.

321, 323, 770 S.E.2d 491 (2015) (citing *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)).

As an aside, the *Filak* Court also required the obligation to be "legal." The illegality of a contract is typically an affirmative defense where the burden rests on the party seeking to have the contract declared illegal. In any event, the Purchase Agreement is not illegal, although it may be impossible in part and would be illegal if Capital One were required to transfer FAR to WG Land specifically.

As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained on account of the breach. *Sunrise Continuing Care, L.L.C. v. Wright*, 277 Va. 148, 156, 671 S.E.2d 132, 136 (2009). Damages do not include the benefit conferred upon the breaching party, but the loss of benefits to the plaintiff. See *Manss-Owens Co. v. Owens & Son*, 129 Va. 183, 204, 105 S.E. 543, 550 (1921). They can, however, include the diminution in value to the property. *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 424, 732 S.E.2d 690, 699 (2012).

The failure to prove damages warrants dismissal of the claim. *Id.* The plaintiff has the burden of proving damages with reasonable certainty; speculation and conjecture cannot form the basis of the recovery. *Id.*

Setting aside the issue of whether there was a material breach, the only evidence of damages offered by WG Land is a valuation of Capital One's property. Evidence of Capital One's gains is not evidence of WG Land's pecuniary losses.

The Court takes, however, this opportunity to address WG Land's Motion for Reconsideration of the Court's March 4, 2016, and April 5, 2015, Orders. The arguments in the motion reflects a misapprehension of the prior rulings.

The issue of attorney's fees and costs has been bifurcated and are set for final determination on June 15, 2016. The failure and inadequacies of discovery from both sides may be placed at issue then. At the hearing, the Court will consider whether fees and costs are recoverable, what fees were reasonably incurred, and what other fees, if any, should offset any fees to which a party may be entitled to recover.

Although it may be a matter of semantics, the Court did not strike WG Land's evidence as to the value of Capital One's property. Rather, the Court concluded that such value is an improper measure of damages under a breach of contract claim.

It also appears the Court was unclear at the April 1, 2016, hearing when it had reconsidered the suggestion it could hold a non-party deponent, Mr. Mortensen, in contempt for failing to appear at a subpoenaed deposition in Richmond. The discovery rules treat non-party deponents differently from party deponents under Va. Sup. Ct. R. 4:5(a)(ii); 4:12(a)(1) (requiring that an application for an order regarding a non-party deponent shall be made to the court in the county or city where the deposition is taken), and 4:12(b).

By April 1, the Court had concluded that holding the non-party deponent in contempt was not an option, although it did reserve authority over Capital One. That matter, however, resolved itself without further involvement of the Court. The remaining objections and arguments WG Land's raises in its Motion are insufficient to support a reconsideration and the issues are now rendered moot.

## IV. Conclusion

The topics relevant to the issues presented would certainly draw out what this Court would find to be interesting historical facts and figures. The parties, however, have made it abundantly clear that that they intend to subject the fact-finder to their competing personal interpretations of what the contract means through the opinions of experts, lay witnesses, parol evidence and arguments of counsel. The credibility of witnesses and the relevance of the parties' conduct are only relevant if the fact-finder has to look outside the documents and apply extrinsic facts to interpret the contract language.

Here, it is unnecessary to stray from the language used in the agreement. The Court finds that the Purchase Agreement and Declarations, while complex and, in parts, laborious to review, especially when burdened with exhaustive advocacy advanced by the parties, require no additional extrinsic evidence to explain its meaning.

The undisputed material facts support and the law supports awarding summary judgment in favor of Capital One. For the reasons stated herein, the Court will enter a Final Order reflecting the following rulings with respect to the Complaint filed by WG Land after the June 15, 2016, Hearing:

Count I: Declaratory Judgment — the Demurrer is sustained and Count I is dismissed;

Count II: Injunctive Relief — Capital One's Motion for Summary Judgment is granted and Count II is dismissed;

Count III: Alternative Claim — Breach of Contract — Capital One's Motion for Summary Judgment is granted, and Count III is dismissed;

Capital One's Plea in Bar concerning the impossibility of applying the formula set forth under Section 28.7(b)(C) is sustained;

WG Land's Motion for Summary Judgment is denied.

With this decision, the following unresolved motions are deemed moot and will not be addressed (filing dates are based upon when the brief was filed, not the motion itself):

Plaintiff, WG Land:

(1) Motion for Protective Order *re* Deposition of Michael Pedulla (filed 4/13);

(2) Motion to Exclude Testimony of Capital One Experts (filed 4/22);

(3) Motion in Limine To Exclude Testimony or Use of Deposition of Gary Humes;

(4) Motion in Limine To Strike and Exclude Untimely Evidence (filed 5/2);

(5) Motion in Limine To Exclude Evidence *re* Allocated Price (filed 5/2).

Defendant, Capital One:

(1) Motion in Limine To Exclude Evidence of Damages Based on Failure To Provide Discovery (filed 3/25);

(2) Motion in Limine To Bar Parol Evidence (filed 4/8);

(3) Motion To Strike Jury Demand (filed 4/15);

(4) Motion To Strike Responses to Requests for Admission and Deem Matters Admitted (filed 4/22);

(5) Motion To Strike Supplemental Expert Report of Richard Parli (filed 4/22);

(6) Motion in Limine *re* Settlement Communications (filed 4/29);

(7) Motion in Limine *re* Capital One Forecasts (filed 4/29);

(8) Motion in Limine To Exclude Expert Testimony of Parli (filed 4/29);

(9) Motion in Limine To Exclude Extrinsic Evidence of IDL (filed 4/29);

(10) Motion in Limine To Exclude Lynne Strobel (to be filed).

The parties should meet and confer and present a proposal on the procedures to be adopted leading up to the June 15, 2016, hearing. The Court will convert the 2:00 p.m. hearing on May 13, 2016, to address such procedures. The May 6 Hearing will be removed from the docket.

## July 27, 2016

The Court awards Capital One $1,894,477.27 in attorney's fees, costs, and expenses as the prevailing party under Section 32 of the September 27, 2000, Real Estate Purchase Agreement entered into by the parties in this cause.

### I. Background Pertaining to Attorney's Fees

This litigation centers on Capital One's alleged breach of the Purchase Agreement ("Agreement") by not allocating for WG Land's use certain density rights made available under the 2010 Comprehensive Plan. As WG Land argues, this alleged breach also entails the failure to reserve such density by not making use of it. The overall factual background is set forth in the May 5, 2016, Letter Opinion, which is adopted and incorporated herein by reference. The following procedural facts are germane to this letter opinion about attorney's fees.

In July 2015, WG Land filed its Complaint seeking declaratory judgment, injunctive relief, and, in the alternative, damages for a breach of contract.

The Complaint included a demand for attorney's fees if WG Land prevailed and specifically identified Section 32 of the Agreement as the basis for such a recovery.

Section 32 of the Agreement provides:

> To the extent permitted by law, in any action or proceeding brought by either party against the other under this Agreement, the prevailing party shall be entitled to recover from the other party the professional fees incurred by the prevailing party, such as appraisers', accountants' and attorneys' fees, investigation costs, and other legal expenses and court costs. The provisions of this Section 32 shall survive Closing and termination of this Agreement.

On January 4, 2016, Capital One filed its Answer and Affirmative Defenses ("Answer"). The Answer contained a "wherefore" clause that demanded fees and costs incurred in defending the action, including attorney's fees. However, the demand failed to identify the basis relied upon as required by Rule 3:25.

The parties had originally scheduled this case for a six-day jury trial starting on May 16, 2016. On February 5, 2016, the Court and the parties agreed to bifurcate the issue of attorney's fees. By Order dated February 11, 2016, the Court scheduled the attorney's fees hearing for June 15, 2016.

Throughout April 2016, the Court heard extensive arguments on the parties' dispositive pre-trial motions. After consideration of the undisputed material facts, arguments of counsel, pleadings, and applicable legal principles, this Court issued a May 5, 2016, Letter Opinion granting Capital One's dispositive motions and denying WG Land's Motion for Summary Judgment. The Court removed the May trial dates from the docket and withheld entry of an order dismissing the case in favor of Capital One until after the attorney's fees hearing.

WG Land subsequently filed a motion to preclude Capital One's claim for attorney's fees on several grounds. First, WG Land argued that, under Rule 3:25, Capital One waived its right to fees by failing to identify the basis for recovery in its Answer. Second, WG Land contended that the finding of impossibility rendered the entire Agreement void, thereby making the attorney's fee provision unenforceable. Third, WG Land claimed that Capital One may not seek the benefit of an attorney's fee provision where it is the prevailing party under an affirmative defense excusing performance, and where Capital One actively sought to promote the impossibility to occur.

In response to the Rule 3:25 issue, Capital One conceded that it did not state the basis for its attorney's fees claim, but argued that no waiver occurs where the opposing party knows of the basis for recovery. In the alternative,

Capital One sought leave to amend its Answer. Capital One also disputed the other grounds asserted by WG Land.

The parties argued the issue of Capital One's entitlement to recover attorney's fees at a hearing held on May 27, 2016. Upon consideration of the pleadings and arguments of counsel, the Court denied Plaintiff's motion to preclude and granted Capital One's motion for leave to amend its Answer to identify the basis for attorney's fees as required by Rule 3:25. The Court deemed Capital One's Amended Answer and Affirmative Defenses ("Amended Answer") timely filed as of May 27, 2016. The Court neither required nor authorized a response to the Amended Answer, but WG Land filed a response on June 16, 2016.

On June 15, 2016, this matter came before the Court for an evidentiary hearing on Capital One's Motion To Recover Attorney's Fees and Costs and WG Land's opposition thereto. The ultimate issue presented was the amount to be awarded. Upon consideration of the relevant pleadings, arguments of counsel, and the testimony and exhibits admitted, this Court awards Capital One $1,894,477.27 in fees, costs, and expenses.

On June 30, 2016, WG Land filed a Motion for Reconsideration of the Court's May 5, 2016, ruling. For reasons stated herein, WG Land's Motion is granted as to the filing of a response to Capital One's Amended Answer, but denied in all other respects.

## II. *Capital One Is Entitled To Recover Attorney's Fees*

To decide whether Capital One may seek attorney's fees, the parties argued the following issues: (1) whether specifying the basis for an attorney's fees claim is unnecessary where the opposing party is already aware of the basis; (2) whether Capital One should be granted leave to amend its Answer to comply with Rule 3:25; (3) whether the Agreement was rendered void alter the Court excused Capital One from complying with a particular section of the Agreement based on impossibility; and (4) whether Capital One may be considered a "prevailing party" and reap the benefits of an attorney's fee provision where it came before the Court with "unclean hands."

### A. *Under Rule 3:25, WG Land's Knowledge of the Basis for Recovery of Attorney's Fees Is Irrelevant to Whether Capital One Must State the Basis in the Pleadings*

Rule 3:25(B) requires that Capital One's demand for fees be made in a responsive pleading. Further, "[t]he demand must identify the basis upon which the party relies in requesting attorney's fees." *Id.* "The failure of a party to file a demand as required by this rule constitutes a waiver by the party of the claim for attorney's fees, unless leave to file an amended pleading . . . is granted under Rule 1:8." Va. Sup. Ct. R. 3:25(C).

Capital One concedes that its demand is deficient, but argues that the failure to specify the basis for fees does not constitute a waiver because WG Land already knew of the basis by identifying it in its Complaint. The Court disagrees.

The waiver provision of Rule 3:25 is clear. Unlike, for example, Va. Code § 8.01-288, which provides an exception to service of process as provided by law where process actually reaches the person to whom it is directed, Rule 3:25 does not, expressly or impliedly, contain such an exception. The failure to identify the basis for recovery of attorney's fees, even where the demand is plainly made, does not satisfy the requirements of Rule 3:25. See *Shen Valley Masonry, Inc. v. Thor, Inc.*, 81 Va. Cir. 89, 91 (Roanoke 2010).

## B. *Capital One Is Granted Leave To File an Amended Answer*

In the alternative, Capital One seeks leave to amend its Answer, claiming that WG Land knew the basis from the beginning and would not suffer prejudice from this late amendment. Rule 3:25(C) provides that a party does not waive its demand for fees if "leave to file . . . is granted under Rule 1:8." Although leave to amend shall be liberally granted in furtherance of the ends of justice, trial courts must consider the prejudice to the other side. *Nelson v. Commonwealth*, 235 Va. 228, 244, 368 S.E.2d 239, 248 (1988).

In exercising its discretion to grant leave, this Court found instructive the facts and reasoning in *Holtzman Oil Corp. v. Green Project*, 2016 Va. Unpub. lexis 13 (Va. 2016). In *Holtzman Oil*, the defendant made a demand for attorney's fees but failed to identify the basis. *Id.* at *15. After the trial court dismissed the complaint with prejudice, the defendant moved for attorney's fees and costs under the contract. *Id.* at *15-16. In response, the plaintiff argued that the demand was waived because the basis was not stated in the defendant's responsive pleading. *Id.* at *16. The defendant then moved for leave to amend, which the trial court granted. The Virginia Supreme Court found no prejudice where the plaintiff "was well aware of the request for attorneys' fees and the basis for the request by all parties, even moving to bifurcate the issue of attorneys' fees," and where the request to amend "was made before the circuit court heard the merits of the attorneys' fee claim at a subsequent hearing." *Id.*; see also *Online Res. Corp. v. Lawlor*, 285 Va. 40, 61-62, 736 S.E.2d 886, 898 (2013).

The facts here are similar to *Holtzman Oil*. WG Land knew that Section 32 of the Agreement contained a fee shifting provision for the benefit of the prevailing party. Although Capital One curiously never expressly identified the Agreement as the basis upon which it relied, WG Land could not have been reasonably surprised by the source of the claim. Section 32 was the same basis upon which WG Land sought the recovery of its own attorney's fees and costs.

Further, Capital One's request to amend came before it filed its Motion To Recover Fees and prior to the attorney's fees hearing. WG Land's

assertion that it proceeded with litigation "in reliance on Capital One's waiver" lacks credence given Rule 3:25(C)'s express provision allowing an amended filing subject to Rule 1:8.

## C. *Temporary Impossibility To Perform an Important, But Not Essential, Provision of the Agreement Does Not Render the Entire Contract Void*

Under the May 5, 2016, ruling, the Court denied WG Land's request for injunctive relief due to, among other grounds, the doctrine of impossibility. WG Land asserts that the attorney's fees provision is unenforceable because the entire Agreement was rendered void when the Court excused Capital One's obligation to perform. The Court neither voided the Agreement nor the specific provisions at issue.

Both parties cite the principle announced in *Golden Pisces, Inc. v. Fred Wahl Marine Constr., Inc.*, 495 F.3d 1078 (9th Cir. 2007), that "a party who prevails by demonstrating that a contract is entirely void, as opposed to divisible, voidable, or rescindable, cannot then seek the benefit of an attorneys' fees provision from that contract." *Id.* at 1083; see also *Mackintosh v. California Fed. Sav. & Loan Ass'n*, 113 Nev. 393, 406, 935 P.2d 1154, 1162 (1997) ("[A]ttorney's fees may be recovered under a prevailing-party attorney's fee provision contained therein even though the contract is rescinded or held to be unenforceable. The legal fictions which accompany a judgment of rescission do not change the fact that a contract did exist."); *Grease Monkey Int'l v. Godat*, 916 S.W.2d 257, 260 (Mo. App. 1995) (holding that the prevailing party could seek the benefit of an attorney's fees clause based on divisibility even after finding that the agreement was rendered void). But see *BLT Inv. Co. v. Snow*, 586 P.2d 456, 458 (Utah 1978) (stating that a party who seeks rescission of the contract in its entirety may not claim the benefit of an attorney's fees provision).

Generally, the doctrine of impossibility renders an entire contract void. See *Smith v. McGregor*, 237 Va. 66, 75, 376 S.E.2d 60, 65 (1989) (agreeing that an unfulfilled condition precedent makes the contract "voidable" at the option of the party). However, where the provision at issue is not the basic purpose of the contract, courts may void that specific provision only. See *Osler Inst., Inc. v. Forde*, 386 F.3d 816, 818 (7th Cir. 2004) (applying Indiana law to permit remaining provisions of a contract to survive where the voided provision could be eliminated without frustrating the contract's basic purpose).

Here, the basic purpose of the parties' Agreement is the sale of real property, including the acreage, improvements thereon, and density rights reallocated from WG Land's nearby properties to the Capital One site. Although important, the density provisions of Section 28.7, which contemplate the distribution of FAR or density that may (or may not) become available in the future, are not a basic purpose of the contract. *Cf.*

*Smith*, 237 Va. at 68-69 (voiding the entire real estate agreement where the entire acreage could not be conveyed).

Moreover, the fact that performance of the density sharing formula became impossible under the present circumstances did not render the density provisions void. If a promisor's contractual performance is rendered impossible, the promisor will be excused from performing, unless it expressly agreed in the contract to assume the risk. *Long Signature Homes v. Fairfield Woods*, 248 Va. 95, 99, 445 S.E.2d 489, 491 (1994). However, "a supervening condition that renders a promisor's performance temporarily impossible will not release the promisor from the duty of performing, but will only suspend that obligation." *Id.* (citations omitted).

Here, when Fairfax County lifted the cap on the FAR associated with the affected properties, it rendered performance by either party of the density provisions temporarily impossible (and unnecessary). Thus, Capital One's obligation to share FAR with WG Land is suspended, not discharged. If a cap or limitation is later imposed by governmental regulations, the duty to share additional FAR under the Agreement may be reinstated depending on the circumstances in existence at the time the cap is lifted.

Even if it could be argued that the density provisions are void, the attorney's fees provision would survive due to the severability clause under Section 22 of the Agreement. See *Reistroffer v. Person*, 247 Va. 45, 50, 439 S.E.2d 376, 379 (1994) (holding that the attorney's fees provision applied where "the parties intended that [such a] provision . . . would be severable" even when the contract is canceled); *Vega v. Chattan Assocs.*, 246 Va. 196, 199, 435 S.E.2d 142, 143 (1993) (finding that a refund and reimbursement provision survived the voiding of the contract due to a severability clause). The severability clause in this contract would have saved the attorney's fees provision as the essential purpose of the Agreement still survives.

Ultimately, Section 32 of the Agreement permits the prevailing party to a dispute arising under the contract to recover its fees, costs, and expenses. Capital One is therefore entitled to recover such fees as the prevailing party in this suit, even when it is temporarily excused from performing due to impossibility.

## D. *Capital One May Recover Attorney's Fees, Despite Any Alleged Contributions to the Impossibility*

WG Land contends that Capital One cannot benefit from the attorney's fees clause where Capital One's "heavy" involvement with Fairfax County in eliminating the FAR cap negated the bargain under the Agreement. Essentially, WG Land raises the doctrine of unclean hands. Capital One contends that WG Land's argument is untimely, inapplicable, and speculative.

The Court need not decide the extent of Capital One's involvement. Assuming *arguendo* that Capital One caused the County to lift the cap

on FAR, the doctrine of unclean hands is only applicable to prevent "a litigant from prevailing *if the litigant seeks equitable relief* and has 'unclean hands'." *Commonwealth, State Lottery Dep't v. Settlement Funding, L.L.C.*, 70 Va. Cir. 203, 206 (Fairfax 2006), *rev'd in part on other grounds, Settlement Funding, L.L.C. v. Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007) (citing *Richards v. Musselman*, 221 Va. 181, 187, 267 S.E.2d 164, 168 (1980)) (emphasis added). Here, Capital One seeks a money judgment — attorney's fees and costs — not equitable relief. Thus, without deciding whether the defense is timely or speculative, the doctrine of unclean hands is inapplicable here.

### III. *Capital One's Fees and Costs Are Reasonable and Necessary as this Case Constituted Complex Litigation Involving Sophisticated Business Entities, High Stakes, and Zealous Advocacy*

From this $120,000,000 lawsuit, Capital One seeks to recover, after self-imposed reductions, $2,246,938.54 in attorney's fees, costs, and expenses. WG Land contends the award should be no greater than $774,083.25, if any at all.

Under the "American Rule," a prevailing party generally cannot recover attorney's fees from the losing party. *Dewberry & Davis, Inc. v. C3NS, Inc.*, 284 Va. 485, 495, 732 S.E.2d 239, 243 (2012). Parties to a contract may, however, adopt provisions that require the losing party in disputes involving the contract to bear the responsibility of attorney's fees and other expenses. *Id.*

The parties in this matter adopted such a contractual provision in Section 32 of the Agreement. As the prevailing party, Capital One has "the burden to present a *prima facie* case that the requested fees are reasonable and that they were necessary." *West Square, L.L.C. v. Commun. Techs.*, 274 Va. 425, 433, 649 S.E.2d 698, 702 (2007). In determining the reasonableness of the fees, the Court may consider, *inter alia*, (1) whether the fees incurred were consistent with those generally charged for similar services; (2) the time and effort expended by the attorneys; (3) the nature of the services rendered; (4) the complexity of the services; (5) the value of the services to the client; and (6) whether the services were necessary and appropriate. *Id.* at 434. Depending on the circumstances of the case, particular factors may have added or lessened significance. *Id.* Further, as the fact finder, the Court applies its own "experience and knowledge of the character of [the] services" provided by the attorneys. *Holmes v. LG Marion Corp.*, 258 Va. 473, 479, 521 S.E.2d 528, 533 (1999).

As observed by other courts and as cited by WG Land, it is certainly true that the determination of an attorney's fees award creates a daunting task for a busy trial judge. See *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d 646, 664 (7th Cir. 1985); *FMC Corp. v. Varonos*, 892 F.2d 1308, 1316

(7th Cir. 1990). However, the Court does not have the luxury of ignoring the evidence admitted, regardless of the time and attention required to process that evidence. Ironically, in a case of this complexity and size, there is no better source of information than the actual billings themselves.

In deciding the amount of the award, the Court reviewed and studied the testimony presented at the attorney's fees hearing, the competing expert reports, the billing invoices and other admitted exhibits, and the written post-trial closing arguments. The Court's review of the issues was augmented by its own personal experience ruling on various pre-trial motions in this action, as well as exposure to other cases. After considering all the relevant evidence and arguments, the Court concludes that Capital One's attorney's fees, costs, and expenses were overall reasonable, necessary, and appropriate.

For this determination, the Court adopts the following cogent observation:

> It is [] important to recognize that, unlike fees shifted under a statute which are imposed on the parties . . . attorneys' fees under a contract are an item of damages (or potential damages) for which the parties specifically bargained, an item of damage expected to be recovered in the event of a breach of that agreement. This is especially true in cases in which the agreement in question is a negotiated one between sophisticated parties, as opposed to a take-it-or-leave-it contract such as a consumer credit card agreement or the cable bill. . . . Contract-based fee shifting, especially in commercial or business cases, truly is a matter of mutual assent between the parties to a contract. In other words, when deciding upon the total consideration for a business transaction, sophisticated parties ordinarily take into account the likelihood of litigation in the event of a dispute. The recovery of attorneys' fees in that event, therefore, is a contemplated item of contractual damage.

*Lyon Villa Venetia, L.L.C. v. CSE Mortg., L.L.C.*, 2015 Md. Cir. Ct. lexis 1, *21-23 (Montgomery 2015) (awarding $2.78 million in attorney's fees without any court-imposed deductions in a $25 million lawsuit resolved on summary judgment).

The parties here are sophisticated business entities "who certainly knew what their contract[] meant at the time they signed [it]. [The parties] were by no means 'forced' to agree to any particular term in an agreement, much less fee shifting." *Id.* at *22. Although the fees and costs must be reasonable and necessary, these factors "should be measured with reference to the scope and nature of the specific litigation and contractual provision at hand." *Id.* at *23. "[A]n arm's length agreement, particularly with a

sophisticated client, as in this instance, can provide an initial 'rough cut of a commercially reasonable fee'." *Id.*

## A. *The Attorney's Fees Must Be Necessary in the Broad Sense*

WG Land leans heavily on the principle that the fees must be necessary to the outcome of the case. *Dewberry & Davis, Inc. v. C3NS, Inc.*, 284 Va. 485, 499, 732 S.E.2d 239, 246 (2012); *Chawla v. BurgerBusters, Inc.*, 255 Va. 616, 623-24, 499 S.E.2d 829, 833 (1998). The word "necessary" is not as limiting as WG Land would have this Court define that term.

*Black's Law Dictionary* provides the following comment about the term "necessary":

> As used in jurisprudence, the word "necessary" does not always import an absolute physical necessity, so strong that one thing, to which another may be termed "necessary," cannot exist without that other. It frequently imports no more than that one thing is convenient or useful or essential to another. To employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable.

*Harter v. Quade*, 10 Va. Cir. 9, 12 (Winchester 1985); accord *McCulloch v. Maryland*, 17 U.S. (4 Wheaton) 316, 413, 4 L. Ed. 579 (1819); see also *United States v. Comstock*, 560 U.S. 126, 126, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010) (explaining that, in the "Necessary and Proper" Clause, "necessary" does not mean "absolutely necessary"; rather, the clause gave Congress "power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise'.").

Virginia has recognized the elasticity of the term to include the definition of "convenient, or useful, or essential, to another." See *Norfolk & W. Ry. v. Denny's Adm'r*, 106 Va. 383, 403-04, 56 S.E. 321, 328 (1907). There is no reason to ignore the application of the broad definition of the term. Thus, in the context of recovering attorney's fees, "necessary" includes that which is "convenient or useful."

However, a prevailing party is also not entitled to a blank check for reimbursement. The United States Supreme Court has commented:

> Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are

not properly billed to one's adversary pursuant to statutory authority."

*Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 1939-40, 76 L. Ed. 2d 40 (1983) (internal citations omitted).

When a party seeks to shift fees, it subjects litigation expenses to an additional level of scrutiny. That scrutiny nonetheless acknowledges that payment of monthly detailed bills by the client is a factor to consider in assessing the reasonableness of the billings.

The Court's ability to reduce counsel's billings does not suggest that the fee arrangement or billings are unreasonable as between the client and its attorneys. The deduction of fees should not require a law firm to adjust its billing practices to conform to such deductions. Ultimately, what is fair compensation between an attorney and the client depends on their contractual relationship and conduct. A deduction by a trial court simply reflects the additional consideration of what fees may be fairly imposed or shifted upon an opposing party under a fee-shifting provision.

**B. *The Participation of Michelle Gambino and Her Supporting Attorneys at Greenberg Traurig Were Reasonable and Necessary***

WG Land argues that the presence of a second major law firm was unnecessary to defend against the claims. Although the Court agrees that one law firm could have handled this case, the Court disagrees with WG Land's overall contention that the use of Greenberg Traurig and its shareholder, Michelle Gambino, constituted an unnecessary and automatically excludable expense.

Ms. Gambino was not merely a shadow of Mr. Wilburn. Pleadings, motions, and depositions were often divided between the two firms. At the hearings, Ms. Gambino presented cogent, concise arguments and took command of the case when Mr. Wilburn was not present. However, this is not a case where she simply stepped up to the plate when Mr. Wilburn could not. Prior to this action, Ms. Gambino worked for McGuireWoods and served as second chair to Mr. Wilburn, including in the prior litigation of this matter. She has considerable experience and enjoys success in the field of complex litigation. Ms. Gambino's role in the prior litigation and her relationship with representatives of Capital One made her and Greenberg Traurig a reasonable and necessary part of this litigation. By no means was she a "shadow attorney."

The fact that Ms. Gambino now works for a different law firm is no barrier to her joining Capital One's litigation team, especially when the two law firms actually occupy the same building. There is no material difference between Capital One's lead counsel choosing several of his partners or senior associates to work on this case and the decision to bring Ms. Gambino and her new firm on board. Had Ms. Gambino not been retained, the work

performed by her team of attorneys would have all been presumably borne by McGuireWoods. Thus, Capital One's decision to retain Ms. Gambino was reasonable, even if there were resulting unavoidable inefficiencies. See *Textron Fin. Corp. v. AIC of Manassas, Inc.*, 2010 U.S. Dist. lexis 74543, at *19 (E.D. Va. July 23, 2010) (finding that the plaintiff company "is entitled to the representation of its choosing").

In addition to Ms. Gambino, the Court observed that there were a number of other attorneys who were just as effective as lead counsel for either party when called upon to represent their client in court. Their advocacy reflected the quality of the services rendered to both parties.

## C. *The Fees Incurred Were Consistent With Those Generally Charged for Similar Services*

According to the charts in Defense expert's report, the 2015 and 2016 hourly rates for Capital One's timekeepers ranged from $75-155 for support staff other than paralegals; $175-260 for paralegals, $225-264 for staff attorneys, $250-325 for associates with one to four years of experience, $300-400 for associates with 5 or more years, and $500-715 for partners, shareholders, and of counsel. Lead counsel's rate in this matter was $550/hour. The Court finds the range of rates reasonable and consistent under a market approach.

With respect to hourly rates, some courts strictly apply the prevailing market rate rule. For example, in *Bores*, the trial judge declared the $480/hour charged by an associate at Latham Watkins's D.C. office with five years' experience "substantially out of line" with the $420/hour billed by the lead local counsel, who was a partner in the Twin Cities area with over twenty years' experience. *Bores v. Domino's Pizza, L.L.C.*, 2008 U.S. Dist. lexis 87252, at *17-18 (D. Minn. Oct. 27, 2008). The rates in *Bores* differ from those in the Northern Virginia area.

WG Land argues that the Court should apply the prevailing market rate set in *Route Triple Seven, L.P. v. Total Hockey, Inc.*, 127 F. Supp. 3d 607 (E.D. Va. 2015). Capital One asks this Court to rely on the matrix established in *Vienna Metro, L.L.C. v. Pulte Home Corp.*, 2011 U.S. Dist. lexis 158648 (E.D. Va. Aug. 24, 2011).

Upon consideration of the background facts of this case, the Court adopts the *Vienna Metro* matrix as proposed by Capital One's expert. The court in *Vienna Metro* created the following chart outlining the 2011 range of hourly rates charged by Northern Virginia firms for complex litigation:

| Paralegal: | Lawyers years of experience: | | | | |
| --- | --- | --- | --- | --- | --- |
| | 1-3 | 4-7 | 8-10 | 11-19 | 20+ |
| $130-350 | $250-435 | $350-600 | $465-640 | $520-770 | $505-820 |

This Court joins the *Vienna Metro* court's approval of an hourly rate of $689 for a partner with 25 years of experience, $523 for an associate with 6 years, and $366 for a second year associate for a case of similar complexity to this action. However, the approved paralegal fees under *Vienna Metro* ranging from $157 to $276 may be high depending on the nature of the paralegal services rendered.

Whereas, in *Route Triple Seven, L.P. v. Total Hockey, Inc.*, 127 F. Supp. 3d 607 (E.D. Va. 2015), the fee applicant proposed hourly rates of $595 for a partner with 14 years of experience, $415 for a fourth-year associate, and $260 for a second-year. The *Total Hockey* court declined to adopt the *Vienna Metro* matrix, finding that the instant case was a "straightforward landlord-tenant dispute," rather than "complex commercial real estate litigation." *Id.* at 619. Accordingly, the *Total Hockey* court found the proposed hourly rates "unreasonably high" and awarded fees at the reduced rate of $420/hour for partners, $275/hour for associates with several years' experience, and $200/hour for associates with only a few years' experience. *Id.* at 619-20. Thus, in the run-of-the-mill breach of contract case or simple landlord-tenant experience, the rates under *Total Hockey* would be more appropriate than the rates adopted by Capital One.

This case, however, involves complex, rather than simple, litigation. The action by WG Land introduced intricate (and ultimately undisputed) facts about contract assignments, floor area ratio, the Comprehensive Plan, land use restrictions, and local zoning ordinances, as well as elaborate legal issues. The parties rarely conceded any of the issues, making this case anything but run-of-the-mill. As such, this case falls within the general category of complex litigation for which firms understandably charge higher rates.

Moreover, the parties are both sophisticated corporate entities with a lot of stake in this litigation. "It is logical that both parties would retain counsel with the best experience, reputation, and ability." *Lyon Villa Venetia, L.L.C. v. CSE Mortg., L.L.C.*, 2015 Md. Cir. Ct. lexis 1, *45 (Md. Cir. Ct. 2015). Both law firms utilized by Capital One are highly regarded national firms with seemingly endless resources. Naturally, these firms would be well-equipped to handle a case of this magnitude, and their rates reflect the costs of the law firms' brand.

Therefore, the Court finds the hourly rates of the timekeepers reasonable as is. See *Suntrust Mortg. v. AIG United Guar. Corp.*, 933 F. Supp. 2d 762, 774 (E.D. Va. 2013) (finding reasonable $695/hour for a partner in Richmond); *White Flint Realty Group, Ltd. P'ship, L.L.L.P. v. Bainbridge St. Elmo Bethesda Apts., L.L.C.*, 2014 Md. Cir. Ct. lexis 3, *19 (Md. Cir. Ct. 2014) (approving $750/hour for an experienced lead trial lawyer in a complex litigation). As proposed by Capital One's expert, the Court will cap the rates of shareholders/partners to that of lead counsel, $550/hour, even though Capital One agreed to, and did pay, the higher premiums.

Capital One's reduction of hourly rates to match that of lead counsel's in order to "harmonize" the billing rates was a reasonable decision that also inured to WG Land's benefit.

WG Land argues that the Court should go further and reduce the hourly rates for supporting attorney's (everyone but lead counsel) to match that of Jennifer Guy, a staff attorney with twelve years of experience whose 2016 rate was $225.00/hour. The Court does not find such a proposal to be proper when deciding whether hourly rates for other attorneys are reasonable.

Hourly rates are driven by the labor costs and affected by the market. On occasion, a particular attorney's rate may be substantially lower than the actual value of her services. A law firm's pricing is affected by the different labor costs associated with the position within the firm, ranging from shareholders/partners to counsel, senior associates, junior associates, and staff attorneys. The law firm's financial obligation to each class of attorney defines the billing rate, and the marketplace creates the demand for such services.

For example, Capital One's expert, Robert R. Vieth, is an experienced and accomplished attorney. Whether his lower billing rate is the result of his practice in a smaller firm, his pricing being commensurate with a Richmond-based firm, or the nature of services rendered in this case, his hourly rate of $475/hour likely falls short of what would otherwise be a reasonable rate commensurate with his knowledge and experience. The fact that he charged less than the actual value of his services does not warrant a reduction of the hourly rates of other experienced attorneys to match Mr. Vieth's rate.

Furthermore, Capital One is a sophisticated consumer of legal services with the bargaining power and ability to negotiate rates with its law firms. If it had wanted McGuireWoods or Greenberg Traurig to adjust the associates' rates to $225.00, it would have likely accomplished some, if not all, reduction to that effect. It chose not to do so and is entitled to make such choices. As noted in *Bores*, although "discretion must be carefully exercised," that discretion lies with the client. *Bores v. Domino's Pizza, L.L.C.*, 2008 U.S. Dist. lexis 87252, at *20, n. 11 (D. Minn. Oct. 27, 2008).

Capital One, however, benefited from the savings that Ms. Guy presented, and to that extent, WG Land enjoys those savings now. WG Land is not entitled to further profit from Ms. Guy's rate being set lower than what her experience and quality of work would suggest. The bargain belongs to Capital One, and her rate does not set the ceiling for what is considered a reasonable hourly rate for the other attorneys in this matter.

D. *The Time and Effort Expended in This Matter Were Warranted, Considering the Nature and Complexity of the Services Rendered*

McGuireWoods billed approximately 3,462 hours in this instant litigation. Greenberg Traurig billed approximately 2,791 hours. Having overseen this

case since January 2016, the Court has witnessed the significant time and effort poured into this contested litigation by both parties, as subsequently reflected in the detailed and exhaustive nature of the billing invoices.

Overall, Capital One's lead counsel credibly testified, and its expert confirmed, that the law firms exercised "significant 'billing judgment' by reviewing all monthly draft invoices and making downward adjustments on each of them before submitting the invoices to Capital One. Many of these adjustments were substantial." The Court took this practice into consideration as it arrived at an award amount.

Notwithstanding any deductions implemented below, the needs of the case, the amount at stake, and the parties' zealous advocacy warranted the 6,253 total hours spent.

Although this case ended at the summary judgment stage, Capital One's attorneys had to thoroughly investigate the claims, seek the expertise of land use planners and other specialists, engage in discovery, participate in mediation, file and argue pre-trial motions, and prepare for trial. "It is this pre-trial work and effort that results in a great majority of complex business litigation cases settling and not proceeding to trial." *Lyon Villa Venetia, L.L.C. v. CSE Mortg., L.L.C.*, 2015 Md. Cir. Ct. lexis 1, *31 (Md. Cir. Ct. 2015).

Whether a matter is complex and requires the number of hours devoted depends on the facts and circumstances of the case. *Black's Law Dictionary* defines complex litigation as "litigation involving several parties who are separately represented, and usually involving multifarious factual and legal issues." *Black's Law Dictionary* 1017 (9th ed. 2009). The definition further borrows a quote that explains:

> What exactly is "complex litigation"? The problem is that no one really knows — or, more accurately perhaps, various definitions do not agree. Complex civil litigation has an "I-know-it-when-I-see-it" quality. Nearly everyone agrees that matters like the massive asbestos litigation, the AT&T antitrust suit, or the remedial phase of a school desegregation case are complex. But trying to find a common thread that both describes these cases and distinguishes them from the run-of-the-mill car crash is difficult.

*Id.*

As mentioned in supporting the hourly rates charged, this case constituted complex litigation for various reasons. The amount at stake was enormous. WG Land claimed damages of $120,000,000. Capital One had already begun construction, and the injunction sought by WG Land exposed Capital One to potential liability and further damages for having to stop construction and perhaps even having to engage in demolition. Also, the facts and legal issues presented were by no means simple or ordinary.

Even simple litigation can become complex as a result of the approach taken by the opposing party. For example, it was difficult to get WG Land to commit to a definitive position. The pleadings resembled a multi-faceted approach where WG Land explored alternative arguments. The discovery disputes highlighted the shifting positions each side adopted. Although this lawsuit was truly only about an injunction, and WG Land informally admitted as much on occasion, the parties litigated matters well beyond the injunction. The declaratory judgment action and the breach of contract claim seeking $120,000,000 were distractions that kept the threat of monetary damages and a jury trial alive.

This Court does not, with the clarity of hindsight, suggest that the strategy employed by WG Land was inherently unreasonable. An entity with fewer resources or fortitude than Capital One may have capitulated when faced with the quadruple threat that (1) construction would be interrupted while the Court and parties developed a workable injunction; (2) future construction would be hamstrung; (3) potential damages in the hundreds of millions of dollars may have to be paid or the entity would have to pay compensation for previously unpaid development rights; and (4) millions of dollars of legal fees would be owed to its own counsel, as well as opposing counsel.

However, the comprehensive, all-inclusive, contest-everything approach adopted by WG Land turned seemingly precise and straightforward parts of this case into complex matters that required Capital One to respond in kind.

E. *The Services Rendered Were Highly Valuable to Capital One As It Prevailed on All Claims and Construction Continues Unabated*

The degree of success obtained has been regarded as the most critical factor. *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S. Ct. 1933, 1941, 76 L. Ed. 2d 40 (1983). The services of the attorneys were unquestionably valuable to Capital One as it prevailed on all claims, including this request for fees.

F. *The Services Provided Were Appropriate and Necessary*

WG Land argues that Capital One's recovery of fees should be limited only to those services which were absolutely necessary to the outcome of the litigation. In other words, WG Land would have the Court award only those fees that were the direct proximate cause of the summary judgment being granted. For example, WG Land claims that Capital One should not recover fees related to discovery, including the taking of "unnecessary" depositions. Capital One counters, and the Court agrees, that this is not the correct standard under Virginia law or the facts and circumstances of this case.

In *Dewberry & Davis, Inc. v. C3NS, Inc.*, 284 Va. 485, 498-99, 732 S.E.2d 239, 245 (2012), the defeated party similarly asserted that the fee applicant "should not recover for unsuccessful motions related to discovery and an unsuccessful motion for partial summary judgment on the counterclaim." Certainly, an unsuccessful motion provides no benefit to a fee applicant's successful outcome. Yet, the *Dewberry* Court held:

> While we have held that a party entitled to recover attorneys' fees may only do so only for those issues on which it prevailed and which relate to the contract, heretofore we have not required the party to show that it was successful in every aspect of its prosecution or defense related to those issues on which it prevailed, and we decline to adopt such a rule now. . . . Merely because a party loses a pre-trial motion . . . does not mean that the pre-trial motion was not appropriate *at the time it was filed and under the circumstances of the case.*

*Id.* at 499 (emphasis added).

Therefore, under Virginia law, fees related to actions not directly linked to a successful event, including mediation, settlement discussions, depositions, and unsuccessful discovery motions, are not rendered unrecoverable simply because they were ultimately unnecessary to the final outcome of the suit.

WG Land argues that Capital One "could have — and should have — short-circuited all of that discovery by simply moving for summary judgment at an early stage of the case." See *Bores v. Domino's Pizza, L.L.C.*, 2008 U.S. Dist. lexis 87252, at *28 (D. Minn. Oct. 27, 2008). Here, Capital One could not have predicted from the onset that it would have won the case at the summary judgment stage.

Summary judgment is considered a drastic remedy and is strongly disfavored. *Klundt v. Klundt*, 78 Va. Cir. 162, 163 (Fairfax 2009) (citing *Smith v. Smith*, 254 Va. 99, 103, 487 S.E.2d 212, 214 (1997)). Although Capital One could have moved for summary judgment earlier, there is always much that could have been done differently in any case when viewed in hindsight.

At the same time, nothing substantially prevented WG Land from noticing its own summary judgment motion for an earlier hearing. Given the Court's experience with the parties, it is more likely than not that WG Land also contributed to any delay in bringing the summary judgment motions before the Court. Where both parties contribute to the delay, neither is penalized.

Moreover, the depositions, motions, and mediation were all moving pieces of a hotly contested action.

A complex case of this size and magnitude calls for mediation. The preparation for mediation offers a dry run for trial and allows counsel to

strategize and assemble various legal and factual arguments to determine the strengths and weaknesses of the case. In terms of complexity, the Court notes that the parties even made use of two mediators, rather than the standard single mediator. Although the parties agreed to split costs of mediation, that agreement was made between the parties and the mediation company in order to move forward with the process. It was not a contract that bars recovery of the fees and costs associated with mediation by the prevailing party under the Agreement.

The Court finds the use of McGuireWoods's national electronic discovery firm, Murphy & McGonigle, reasonable and necessary for a case of this size and complexity. Although the parties ultimately failed to agree on and execute an electronic discovery plan, the effective management of existing electronic discovery is necessary and expected from the attorneys who handled this case. This is true even though further electronic discovery proved to be unnecessary when the dispositive issues were ruled upon by this Court.

The expenses and costs incurred by the experts were similarly reasonable and necessary. Harvey & Associates rebutted WG Land's proposed expert on the value of land as enhanced by the development and zoning rights associated with Capital One's development. Although summary judgment ended the need for the rebuttal expert, it would have been irresponsible for Capital One to simply ignore WG Land's proposed expert and gamble that the case would be resolved on summary judgment.

As for the work performed by James Zook and John McBride, although a great deal of their proposed testimony focused on legal issues arising from the zoning laws and the history of the 2010 Comprehensive Plan, the need for their services in addressing the feasibility or appropriateness of granting an injunction supports the use of such experts.

The fact that the experts were not actually called to testify at trial does not eliminate WG Land's contractual obligation to reimburse Capital One for reasonably incurring the expense of assembling the experts. This also includes the work done by Urban, Ltd.

The Court is aware that the range of fees commanded by experts can be broad. To some extent, evidence of the reasonableness of their fees can be gleaned from the billings the client paid, the integrity of the expert witnesses, and the absence of errors in such billings. There are limits, however. But, once again, the size and complexity of this litigation suggest that those limits become more flexible. Based on the circumstances, the experts' fees were reasonable and necessary.

*G. It Is Unnecessary for Capital One To Segregate Billings for Work under the Restrictive Covenant from Work under the Purchase Agreement*

A fee applicant is not entitled to recover fees for services rendered on claims which do not permit the recovery of attorney's fees. *Ulloa v.*

*QSP, Inc.*, 271 Va. 72, 81-82, 624 S.E.2d 43, 49 (2006). "[W]here multiple claims exist, only one of which permits the recovery of attorney's fees, the party requesting attorneys fees must fairly and reasonably separate out its attorneys fees with specificity." *Couch v. Manassas Autocars, Inc.*, 77 Va. Cir. 30, 32 (Prince William 2008) (citing *Ulloa*, 271 Va. at 83).

WG Land's argument that Capital One may not recover for work spent on the restrictive covenant, as opposed to the Agreement, is unconvincing given the procedural posture of this case. WG Land brought three claims against Capital One: (1) declaratory judgment, (2) injunction, and, in the alternative, (3) breach of contract. All three claims depended on the enforceability of a provision of the Agreement and as repeated under a restrictive covenant recorded pursuant to the Agreement. Capital One's defense to the case focused on the language under the contract as repeated in the covenant. The controlling language and dispositive provisions between the contract and covenant were inextricably intertwined and amounted to inseparable claims. Ultimately, Capital One prevailed on its defense of the three claims, all of which were recoverable under the Agreement. See *Manchester Oaks Homeowners Association v. Batt*, 284 Va. 409, 430, 732 S.E.2d 690, 703 (2012). Capital One did not otherwise assert any claims against WG Land.

With respect to the standing issue, the Court sustained Capital One's argument on standing under the covenant, but found that WG Land had standing under the Agreement. Capital One's fees and costs incurred in litigating the standing issue were reasonable and necessary given that WG Land had been sanctioned in the earlier litigation on standing grounds and because discovery responses related to the standing issue started off in a vague and conclusory manner.

In summary, this Court considered the factors highlighted by the parties and their respective experts, which are also part of the Johnson/Barber factors adopted by the Fourth Circuit. See *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). After considering the factors stated above, the Court finds that the lodestar amount based on the reasonable rates and hours, excluding "fees on fees," and subtracting $25,700.70 (correction to interpretation of Greenberg Traurig's billings) is $2,359,435.89.

### IV. Deductions from the Lodestar Sum ($494,056.12)

From the lodestar amount, the Court revisited the billings to draw out specific deductions. The Court addresses briefly the deductions applied and explains its decision for declining certain proposed deductions.

A. *Redacted Billing Entries ($195,002.50)*

With respect to redacted billings, Capital One's reliance on *Tureson v. Open Sys. Scis. of Va., Inc.*, 86 Va. Cir. 473 (Fairfax 2013), is misplaced when it argues that the Court may disregard the redactions. *Tureson* focused on block billings, and not necessarily redactions. However, the Court agrees that when either block billings or redactions leave intact the gist of the billing event, a court may still find that time to be recoverable. As long as the reviewing court is not inhibited in its analysis, such redactions will not *per se* result in the denial of compensation. See *Alpine Bank v. Hubbell,* 2010 U.S. Dist. lexis 39141, at *18-*19 (D. Colo. Mar. 24, 2010).

After reviewing the redactions, there were a number of instances where the Court could not find that Capital One had met its burden. Capital One's closing arguments conceded as much. It sought to recover redacted entries amounting to $99,154.00, which is far less than the total value of all the redactions.

Examples of redacted billings for which the Court could not even being to guess at the work performed include the following:

11/17/15 (MGW) L120 — Teleconference with client [redacted]. 0.5 - $132.00

12/01/15 (GT) L120 — Analysis/Strategy — Research [redacted] for [redacted] statute authorizing [redacted]. 1.0 - $575.00

01/05/16 (GT) L110 — Fact Investigation//DevWork on [redacted]. 0.3 - $172.50

02/17/16 (MGW) L110 — Review case materials for [redacted]. 3.9 - $1,267.50

03/02/16 (GT) L120 — Analysis/Strategy — Review S. Murphy emails re [redacted]. 1.4 - $805.00

03/30/16 (MGW) L120 — Analysis/Strategy — Analyze state law re [redacted] for upcoming summary judgment pleading. 1.5 - $300.00

04/18/16 (GT) Analyze [redacted] law re [redacted] and [redacted] upcoming motions. 2.60 [not stated]

05/03/16 (GT) Analyze [redacted]. 3.70 [not stated]

Some redactions offer enough information for the Court to find that the work was directed towards this litigation. However, as examples, the following redactions still left the Court guessing as to the precise nature

of the work and whether such time spent was appropriate to the particular issue:

04/27/2016 (GT) Review Ridge Tran's Order re: [redacted]. 1.10 [not stated]

04/27/2016 (GT) Review deposition transcripts for information responsive to questions from Court re [redacted]. 1.60 [not stated]

Although it is gratifying that counsel spent time responding to the pre-trial orders issued in this case, unless the particular Order or question is disclosed, it is impossible for the Court to determine that the time spent was appropriate to the specific question.

Balancing those examples with the prevailing party's entitlement to recover those fees and costs, and reconsidering some entries after studying the billings, the Court agrees with Capital One that there are some entries where a study of the bills furnishes enough information for the Court to conclude that the fees charged were both reasonable and necessary. Thus, in reconsidering its blanket assertion that it would not award any redacted billing, the Court approves the following entries proposed by Capital One:

10/1/2015 MDG 2.4 - $1,380.00

12/3/2015 MDG 1.3 - $747.50

12/29/2015 MDG 3.4 - $1,955.00

1/25/2016 MDG 2.0 - $1,150.00

1/26/2016 MDG 0.8 - $460.00

1/28/2016 MDG 0.4 - $230.00

2/1/2016 MDG 0.4 - $230.00

2/18/2016 MDG 0.9 - $517.50

2/18/2016 MAH 1.6 - $480.00

2/19/2016 MAH 3.4 - $1,955.00

2/25/2016 GDB 1.5 - $330.00

2/25/2016 MDG 1.4 - $805.00

2/25/2016 MDG 2.0 - $1,150.00

3/1/2016 GDB 1.2 - $264.00

3/8/2016 MDG 3.8 - $2,185.00

3/8/2016 MDG 4.4 - $2,530.00

3/31/2016 MDG 0.4 - $230.00

4/6/2016 MAH 3.3 - $990.00

4/18/2016 DGB 4.0 - $2,400.00

4/23/2016 MDG 0.9 - $517.50

4/27/2016 MDG 1.1 - $632.50

4/29/2016 MAH 1.8 - $540.00

5/4/2016 TJM 2.3 (of 5.3) - $1,207.00

Total Credited Back to Capital One: $22,886.00

In addition to the items specified by Capital One, the Court credits back the following entries:

11/19/15 TCB 2.0 (of 4.9) - $1,100.00

11/20/15 MDG .20 (of 1.2) - $115.00

12/29/15 MDG 2.5 (of 3.4) - $1,437.50

4/11/16 GDB 0.2 - $35.00

4/28/16 GDB 0.5 - $87.50

4/29/16 TAQ 1.7 - $637.50

4/30/16 MDG 2.5 - $1,437.50

5/3/16 TJM 2.3 (of 5.4) - $1,207.50

Total Credited Back to Capital One: $6,057.50

WG Land contends that the total amount to deduct for redacted entries is $223,946.00. Adding in the credits above, the total the Court deducts for redacted entrees is $195,002.50.

B. *Deductions by Capital One's Expert ($169,921.15)*

Capital One's expert provided a list of deductions consisting of $118,110.55 (duplicative or unnecessary billing entries), $49,185.00

(billing rate adjustment), and $2,625.60 (correction to McGuireWoods billings), which total $169,921.15.

In reviewing the list, there were a number of deductions that the Court would not have imposed. For example, the expert deducted time spent by lead counsel. In a case of this magnitude, lead trial counsel is normally required to oversee as much of the trial preparation as possible.

Additionally, the Court would not have necessarily eliminated the time of Ms. Guy for assisting lead counsel in depositions and summarizing hearing results for the litigation team. Based on the Court's own experiences, these services are reasonable and necessary in this type of litigation. Nonetheless, given that Capital One has offered those reductions, the Court accepts them.

## C. *Paralegal and Land Use Specialists ($87.50)*

WG Land argues that Capital One is not entitled to recover fees incurred by its paralegals and other non-lawyers. Section 32 of the Agreement provides for the recovery of "legal expenses." The provision does not limit recovery to only the fees charged by attorneys. In fact, in assessing whether a petition for fees is reasonable, the Court expects to find work being assigned to lower billing timekeepers, such as the land use specialist and paralegals, whenever practicable.

There is one instance where the Court finds that the use of a paralegal is unreasonable for fee-shifting purposes, and that is where a paralegal billed time for legal research on a basic principle of contract law in a case where there are already in place a sizeable number of experienced attorneys with knowledge of the applicable issues.

03/30/16 LYB .50 - $87.50 Legal Research for Va. Law on breach of contract if the party claiming breach itself did not perform.

The Court otherwise approves the use of paralegals and finds their fees recoverable. The firms appropriately did not charge Capital One for administrative costs, including overtime for secretarial support and the majority (but not all) of Lexis/Westlaw charges.

## D. *Discovery Motions Under Rule 4:12 ($0)*

With respect to discovery motions, the Court confronted various discovery disputes that appeared to be even-handed in fault. Although Rule 4:12 mandates the imposition of fees to the prevailing party in a discovery dispute, that mandate may be excused if the losing party's actions were substantially justified or the imposition of fees would be unjust. Given the contractual prevailing party provision, the Court deemed that the imposition of fees after each hearing on a discovery issue would have been ineffective and potentially unjust, thereby reserving the imposition of fees until the conclusion of the case. As Capital One is the prevailing party, there is no

longer a need to parse out the fees and costs that would otherwise have been imposed under Rule 4:12.

As for offsetting the recovery, WG Land did not submit bills sufficient to allow the Court to consider the recoverability of fees associated with discovery motions under which WG Land prevailed.

### E. *Unexplained/Unreasonable Charges ($2,131.25)*

The Court deducts two other line items found in the billings. The first item is for a sizeable courier charge for which there is no description of the service provided:

10/27/15 Advance Courier Service [no description] $50.00.

The second deduction is for a billing of 18.5 hours in a single day:

03/30/2016 JAG 18.5 Preparation of multiple hearings' editing and revising summary judgment motion. $4,162.50.

Although the Court has no doubts or concerns about the accuracy of this billing, this Court generally will not compensate counsel for spending more than 10 billable hours on any single day. The Court finds that the amount of time and effort required to bill more than 10 hours is rarely necessary, appropriate, or productive and therefore reduces such time by 50% from $4,162.50 to $2,081.25.

As an aside, the Court is similarly troubled by other billings exceeding 10 hours in any given day that did not include time spent in court. However, the Court finds that the deductions from the redacted billings and the percentage taken off from the final sum to be sufficient to address the billings that exceeded 10 billable hours of work outside of court. Further, McGuireWood's lead counsel testified credibly that many late evenings and work into early morning hours were eliminated from his billings. The Court finds that decision to be appropriate.

### F. *Copying/Research Costs ($7,647.78)*

The following copying and Lexis/Westlaw costs will be reduced from the final amount, as overhead charges are not recoverable under the Agreement:

10/27/15 - $2.64

10/27/15 - $65.77

11/16/15 - $116.00

11/30/15 - $228.32

12/09/15 - $2.96

01/29/16 - $53.52

02/10/16 - $20.25

02/29/16 - $190.08

03/29/16 - $2,073.92

04/30/16 - $3,606.48

05/20/16 - $1,256.24

05/23/16 - $30.24

05/23/16 - $1.36

Total: $7,647.78

G. *Mileage and Parking Fees ($750.79)*

Although Capital One's expert eliminated some mileage and parking fees, the following were not taken into account:

12/04/15 Parking - $10.00

12/04/15 Parking - $6.00

12/11/15 Parking - $2.00

01/07/16 Parking - $4.00

01/09/16 Mileage - $10.69

01/09/16 Parking - $4.00

02/26/16 Parking - $10.00

03/02/16 Mileage - $10.69

03/02/16 Parking - $8.00

03/08/16 Parking - $2.00

03/25/16 Parking - $8.00

04/01/16 Parking - $10.00

04/07/16 Parking - $10.00

04/07/16 Mileage - $10.80

04/07/16 Mileage - $10.80

04/07/16 Mileage - $10.80

04/07/16 Parking - $2.00

04/16/16 Mileage - $13.50

04/11/16 Mileage - $116.64

04/13/16 Mileage - $181.44

04/17/16 Mileage - $16.69

04/19/16 Mileage - $122.04

04/21/16 Mileage - $116.64

04/26/16 Parking - $10.00

04/30/16 Mileage - $22.03

05/01/16 Mileage - $22.03

Total: $750.79

H. *Meals ($543.36)*

The following is a list of meals that were not addressed by Capital One's expert. While the reimbursement of meals may be considered by Capital One to be beneficial to sustain a positive client/attorney relationship, they are unnecessary to the litigation.

02/26/16 - $2.75

04/06/16 - $14.21

04/07/16 - $1.36

04/11/16 - $163.77

04/16/16 - $13.54

04/18/16 - $205.64

04/28/16 - $90.10

05/03/16 - $51.99

Total: $543.36

I. *Amount of Timekeepers, Redundancies, and Inefficiencies ($117,971.79)*

Capital One employed a total of 41 timekeepers between McGuireWoods, Greenberg Traurig, and other firms. From this Court's prior experiences, the use of multiple timekeepers leads to unavoidable inefficiencies. Such additional costs to litigation occur when there is a change of timekeepers or introduction of new timekeepers during the middle or later stage of the case. Even under the best conditions, it is difficult to prevent redundancies.

Accordingly, the Court deducts 5% of the lodestar amount of $2,359,435.89, which is $117,971.79. See *Unger v. Beatty*, 52 Va. Cir. 289, 297 (Fairfax 2000) (utilizing percentage deductions); see also *Spell v. McDaniel*, 852 F.2d 762, 772 (4th Cir. 1988) (same).

This deduction also factors in the redundant and inefficient time spent on pursuing unsuccessful discovery motions, the standing argument under the restrictive covenants, and the inherent inefficiencies arising from the use of multiple lawyers from multiple law firms.

In sum, after taking into consideration all of the facts and circumstances of this case, the Court finds the total amount of deductions to be as follows:

Redacted Entries - $195,002.50

Deductions by Capital One - $169,921.15

Paralegal/Specialist - $87.50

Discovery Motions - $0.00

Unexplained/Unreasonable Charges - $2,131.25

Copying/Research - $7,647.78

Mileage/Parking - $750.79

Meals - $543.36

Timekeepers/Redundancies - $117,971.79

Total: $494,056.12

Subtracting that amount from the lodestar produces a total of $1,865,379.77 as the reasonable, necessary, and appropriate amount related to the litigation of the underlying matter.

## V. *Capital One May Recover "Fees on Fees" under the Contractual Provision, Which Amounts to $29,097.50*

The final issue related to attorney's fees is whether a prevailing party may recover the fees incurred in litigating the amount of fees where the basis for recovery is contractual. The Court refers to this principle as "fees on fees." Citing to a Florida case, WG Land answers in the negative. Capital One, relying on federal Virginia cases, answers in the affirmative.

In Virginia, the "parties' contract becomes the law of the case unless it is repugnant to some rule of law or public policy." *Winn v. Aleda Constr. Co.*, 227 Va. 304, 307, 315 S.E.2d 193, 194 (1984); see *East Tex. Salvage & Mach v. Duncan*, 226 Va. 160, 306 S.E.2d 896 (1983) (construing the attorney's fees provision to determine limits of liability). The Virginia Supreme Court has not directly addressed whether a prevailing party may seek "fees on fees" where the basis for recovery is contractual.

Where the basis for fees is statutory, Virginia generally permits recovery of "fees on fees." See, e.g., *Cardinal Holding Co. v. Deal*, 258 Va. 623, 632, 522 S.E.2d 614, 619 (1999) (reading "[fees] incurred because of the filing of the pleading" in Va. Code § 8.01-271.1 as permitting a recovery of those fees and expenses incurred in pursuing a sanctions award arising out of such a claim); *Couch v. Manassas Autocars, Inc.*, 77 Va. Cir. 30, 38 (Prince William 2008) ("[A]n attorney may be reimbursed for his time spent in seeking fees under a fee-shifting statute."); *Dickerson v. Ford Motor Co.*, 74 Va. Cir. 509, 511 (Roanoke 2008) ("Many courts have consistently held that attorneys may be awarded, under statutory fee authorities, compensation for the expenses of, and time spent, litigating the issue of a reasonable fee.").

In *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 47 Va. Cir. 193 (Richmond 1998), *rev'd in part on other grounds*, 259 Va. 92, 524 S.E.2d 420 (2000), the court awarded "fees on fees" under Va. Code § 18.2-500 and stated the following public policy:

> [T]he same legislative intent necessarily inherent in the enactment of fee-shifting statutes requires that lawyers be reimbursed for their time in enforcing the fee-shifting provisions of those statutes. Otherwise, lawyers will be discouraged from bringing the very claims the legislature has seen fit to encourage.

*Id.* at 205 (quoting *Green v. Insurance Claim Cars, Inc.*, 45 Va. Cir. 158 (1998) (fees under Va. Code § 59.1-207.14)).

The public policy concern for permitting "fees on fees" in the statutory context is not present in this case. The clients (and lawyers) here would not have been discouraged from bringing an action based on the contract merely because the bills for litigating the amount of fees to be awarded are unrecoverable.

None of the cases cited above were persuasive to this Court. Nor were the civil rights cases cited by Capital One. See *Trimyer v. City of Norfolk*, 58 F.3d 68, 77 (4th Cir. 1995) (42 U.S.C. § 1988); *Saleh v. Moore*, 95 F. Supp. 2d 555, 573 (E.D. Va. 2000) (same).

WG Land's case was also unpersuasive. In *State Farm Fire & Cas. Co. v. Palma*, 629 So. 2d 830 (Fla. 1993), the court considered the issue in the context of a statutory basis for recovery. First, the court held that fees incurred in litigating the issue of entitlement to fees were recoverable. *Id.* at 833. On the contrary, the court found that "fees may [not] be awarded for litigating the amount of attorney's fees." *Id.* Ultimately, the *Palma* court's holding hinged upon an interpretation of statutory language which is neither present nor at issue here.

This Court found more persuasive cases permitting a judgment creditor to recover, pursuant to a contract, post-judgment collection costs. In *Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 403 S.E.2d 334 (1991), the plaintiff sought to recover judgments on three promissory notes, two of which contained provisions allowing the creditor to recover costs of collection. As part of the request for fees, the plaintiff sought post-judgment attorney's fees associated with collection efforts. *Id.* at 449. The *Mullins* court held that, "[i]f future services of an attorney will be required in connection with a case, the fact finder should make a reasonable estimate of their value." *Id.* Thus, under *Mullins*, a fee applicant may seek post-judgment attorney's fees associated with collection efforts.

Similarly, in *Elstner v. Golden*, 56 Va. Cir. 378 (Spotsylvania 2001), a creditor sought to recover fees incurred in connection with a debt collection. The contract provided that the debtor was obligated to pay "all attorney's fee[s] which shall be fixed at one-third of [the] outstanding balance, plus court costs, whether suit is filed or not." *Id.* at 379. In determining the reasonableness of the fees, the *Elstner* court considered whether fees "devoted to litigating" the fee award were recoverable. *Id.* at 380. Noting that the authorities were split on the particular issue, the court held that "the better view, at least under the facts of this case, is that such efforts should be included in calculating the amount of the fee." *Id.*

Thus, under *Mullins* and *Elstner*, the reimbursement of fees accrued post-judgment pursuant to a contractual provision does not violate a ride of law or Virginia public policy. Accordingly, if the contract permits, then the fees incurred in litigating the amount to be awarded and the bills of the fee expert, if any, are recoverable.

Here, Section 32 provides for the recoverability of fees "[t]o the extent permitted by law." Based on a plain interpretation, the fees associated with the attorney's fees hearing were "incurred by the prevailing party" in this action. There is no language indicating that the parties intended to bar the recoverability of "fees on fees."

Moreover, the bifurcated method for litigating attorney's fees convinces this Court that a fee applicant should be permitted to recover "fees on fees." Absent bifurcation of the issues, a fee applicant must present evidence of attorney's fees at the damages stage of the trial. See *Lee v. Mulford*, 269 Va. 562, 611 S.E.2d 349 (2005). Under this scenario, attorney's fees incurred in proving the reasonableness of the fees would constitute "an item of damages" and thus would be integrated into the primary litigation. See *East Tex. Salvage & Mach. v. Duncan*, 226 Va. 160, 161, 306 S.E.2d 896, 897 (1983); *R. L. Moore, Inc. v. Shawn*, 23 Va. Cir. 117, 119 (Fairfax 1991).

In sum, Capital One may recover "fees on fees" under the Agreement. The Court finds such fees reasonable and necessary and will add $29,097.50 to the award of $1,865,379.77 for a final total of $1,894,477.27.

## VI. *WG Land's Motion for Reconsideration Is Granted with Respect to Leave To File a Response to Capital One's Amended Answer, but the Motion Is Otherwise Denied*

WG Land filed a motion to reconsider the May 5, 2016, ruling where this Court (1) deemed admitted new matters raised in Capital One's original Answer; (2) sustained the Demurrer as to the declaratory judgment count; and (3) found that the 2010 Comprehensive Plan removed the previous cap on density limitations for the affected properties and granted Capital One's dispositive motions.

The Court grants WG Land's request to file a response to Capital One's Amended Answer and deems WG Land's response timely filed as of June 16, 2016, *nunc pro tunc*. The June 16, 2016, pleading modifies the Court's findings in the May 5, 2016, Letter Opinion. However, those modifications do not change the Court's conclusions.

WG Land's memorandum seeking reconsideration highlights the reasons why both parties incurred substantial fees and costs in this litigation. Allowing WG Land to respond to the new matters raised by Capital One adds layers of additional issues that were ultimately unnecessary to the Court's ruling on the dispositive motions.

With respect to sustaining the Demurrer, the Court did not reverse a prior decision of a colleague. A pretrial order is, by definition, an interlocutory order, and one that remains under the jurisdiction of the trial judge. Once the Chief Judge found that the case was of such complexity that it required an assignment to a particular judge, all pretrial orders became subject to review and reconsideration by the assigned judge. The Court simply reconsidered the pretrial order entered with respect to the Demurrer given the additional arguments presented.

Regardless of WG Land's belief that a broader interpretation of the declaratory judgment action may touch upon issues not part of the final

judgment, that assumption is only correct if the May 5, 2016, Letter Opinion is read narrowly, which it should not be.

The Court is not bound by a party's interpretation of the plain language of a contract that is inconsistent with the language utilized. As previously held, the plain meaning of Section 28.7(c) makes it clear that neither party is required to cooperate with one another in applying for additional FAR. As Section 28.7(c) clearly states:

> Notwithstanding the foregoing, neither Capital One nor West* Group shall have any obligation to cooperate in, and shall have the right to oppose, any action proposed by the other that would result in an adverse financial impact or in an adverse density limitation (other than the impacts of limitations expressly contained in this Agreement).

The "restrictive covenant" that WG Land continues to tout as an enduring and indefinite benefit ignores the eight-year limitation on further development and the ten-year limitation on the transfer of Capital One's property to third parties. The Court did not accept WG Land's interpretation of the Agreement as vesting upon it a permanent right to restrict development, and defined differently the impact of Section 28.7(c) on Section 28.7(b)(C) as further modified by the removal of the cap on FAR.

The actions undertaken by Capital One neither supported an injunction nor constituted a breach of contract under the undisputed material facts presented. The additional arguments, even taken in the light most favorable to WG Land, presents insufficient reasons to warrant a reconsideration of the judgment awarded to Capital One.

## VI. *Conclusion*

For the reasons set forth above, the Court awards Capital One the sum of $1,894,477.27 in attorney's fees, costs, and expenses, finding that amount reasonable, necessary, and appropriate.